**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NUEVA ENGINEERING, INC., Respondent.**

**No. 84–1616.**

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1985.

Decided May 6, 1985.

---

Allen Poppleton, Meryl C. Weiser and Weinberg & Green, Baltimore, Md., for respondent.

Wilford W. Johansen, Acting General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, and John G. Elligers, Washington, D.C., for petitioner.

Before SPROUSE and WILKINSON, Circuit Judges, and NORTHROP, Senior United States District Judge for the District of Maryland, sitting by designation.

NORTHROP, Senior District Judge.

The National Labor Relations Board petitions for enforcement of its order, 269 N.L.R.B. No. 172, adopting the findings and conclusions of the Administrative Law Judge, that Nueva Engineering, Inc., violated Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by threatening, surveilling and interrogating various employees as to union activities, and Section 8(a)(3) and (1), 29 U.S.C. § 158(a)(3), (1), by discharging one employee because of her union activities. Nueva challenges enforcement, arguing that the Board's order is not supported by substantial evidence on the record considered as a whole and that it was improperly denied access to exculpatory material within the Board's investigatory files. We disagree and grant enforcement of the Board's order.

## I.

## BACKGROUND FACTS

Nueva Engineering, Inc., is a Maryland corporation engaged in the production of electronic circuit boards. During the relevant time period, early August, 1982, Nueva employed approximately 88 employees. Thomas Pozzouli was the Vice President and General Manager. Howard Lee Brown was the production foreman who supervised three departments, including the shipping department.

Beginning the week of August 9, 1982, the union[1] conducted an organizational drive at the Nueva plant in Baltimore. Union leaflets were distributed to the employees, some were posted at the plant and some of the union literature was sent to Nueva officials. There is no question that the literature was designed to encourage employees to join and support the union.

Cecilia Leach, an employee in Nueva's shipping department, was a union propo-

---

1. Petroleum, Construction, Tankline Drivers & Allied Employees, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

nent. When the union campaign started, Leach signed a union authorization card and assisted the union organizers in the collection of authorization cards. On August 9, 1982, two union organizers met with Leach and four other employees during lunch to discuss the campaign. Leach was the only shipping department employee to attend this meeting.

Nueva strongly opposed the union. On several occasions during the week, foreman Brown, when passing Leach, displayed union literature and made comments such as "pricken union" and "the union is not getting in here." On one occasion, Brown told Leach: "[I]f you don't like working for this company and you are for all the union business, then why don't you work somewhere else because I don't want no f_____g union in here." [2] On at least one occasion, Vice President Pozzouli assembled the employees from the shipping and routing departments and told them that "if the Union was voted in ... the owners of the company would take it back to a prototype shop which meant that the company could be run with eight to ten people." [3] Pozzouli further warned the employees that if the union was selected, "there would be indefinite layoffs whereas right now it would be just temporary layoffs." Pozzouli added that the union was "backed" by criminal elements.

On August 16, 1982, the same day of Pozzouli's speech, the union organizers scheduled an employee meeting to be held after work at the local high school. Notices announcing the meeting were posted in the plant. It was admitted that Nueva received a copy of the meeting notice. Sometime during the day, the meeting was cancelled and word was circulated among the employees. After work that day, employee Charles O'Neill drove fellow employees Cheryl Langrehr and Nola Coleman home on a road that passed the high school

where the union meeting had been scheduled. As they passed the school, they noticed Brown and another Nueva supervisor driving about in the school parking lot. The two supervisors then drove out of the school parking lot and followed the employees to Coleman's home. The next day, employee Coleman informed Brown that she "didn't appreciate being followed home," and Brown apologized for upsetting her. Several days later, O'Neill asked Brown why he had followed the employees home after work. Brown told O'Neill that he was "trying to find the union meeting." Foreman Brown explained to O'Neill that when no one appeared at the school, he followed the employees because he thought they were "going to another location where the meeting would be held."

Earlier in the month of August, 1982, Nueva made a business decision to implement a general layoff of employees. In accordance with Nueva's regular practice, each foreman used his own discretion in choosing employees for layoff. On August 16, 1982, the day the first union meeting was scheduled, foreman Brown, the supervisor of the shipping department, chose employee Leach for layoff. At that time, she was the most senior of the four shipping department employees and had recently been awarded two merit wage increases.

Finally, in late August, Brown and employee O'Neill were talking in Vice President Pozzouli's office. Brown first told O'Neill that he "did not like unions" and then asked O'Neill how he felt about unions. O'Neill told Brown that he supported the union. Brown replied that if the employees voted for union representation, the "alternative would be to go into a proto shop and institute a big layoff."

Based on the foregoing facts, the Board found, in agreement with the ALJ, that Nueva violated Section 8(a)(1) of the Na-

---

**2.** Foreman Brown denied using profanity. The ALJ did not make a finding as to whether Brown actually used the profanity but found that the conversations, at least in substance, did take place.

**3.** ·As explained by the ALJ, the term "prototype shop" indicates a type of circuit board manufacturing which requires fewer employees. At the relevant time, Nueva employed over 80 people. If Nueva converted into a "prototype shop" it would require only eight to ten employees.

tional Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), by threatening employees with a work force reduction if they selected a union as their bargaining representative, by interrogating an employee and by engaging in surveillance of employees thought to be engaged in union activities. The Board also found, in agreement with the ALJ, that Nueva violated Section 8(a)(3) and (1) of the Act, 29 U.S.C. § 158(a)(3) and (1), by laying off employee Leach because of her union activity. The Board's order requires Nueva to cease and desist from these unfair labor practices and from "in any like or related manner" interfering with, restraining or coercing employees in the exercise of rights guaranteed by the Act. Affirmatively, the Board's order requires Nueva to make Leach whole for any loss of earnings suffered by reason of the discrimination against her, to expunge from its records any reference to her layoff, and to post an appropriate notice.[4]

## II.

### SECTION 8(a)(1) VIOLATIONS

■ Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain or coerce employees in the free exercise of their Section 7 rights. Section 7, 29 U.S.C. § 157, guarantees employees the right "to form, join, or assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining...." In evaluating an employer's conduct under section 8(a)(1), "[t]he test is not whether the language or acts were coercive in actual fact, but whether the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate." *Corrie Corp. v. NLRB*, 375 F.2d 149, 153 (4th Cir.1967). *See NLRB v. Brookwood Furniture*, 701 F.2d 452, 459 (5th Cir.1983). Thus, the employer's conduct must be assessed within the totality of circumstances surrounding each occurrence at issue. In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89

S.Ct. 1918, 1941, 23 L.Ed.2d 547 (1969), the Supreme Court expressed a now familiar rule on section 8(a)(1) coercion:

Any assessment of the precise scope of employee expression, of course, must be made in the context of its labor relations setting. Thus, an employer's rights cannot outweigh the equal rights of the employees to associate freely, as those rights are embodied in § 7 and protected by § 8(a)(1) and the proviso to § 8(c). And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear.

■ Our review of the Board's findings of section 8(a)(1) violations is, of course, limited. "If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first place." *NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 193 (4th Cir.1984), *citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Kiawah Island Co., Ltd.*, 650 F.2d 485, 489 (4th Cir.1981). This is particularly true where, as here, the record is fraught with conflicting testimony and essential credibility determinations have been made. *NLRB v. Air Products and Chemicals, Inc.*, 717 F.2d 141, 145 (4th Cir.1983); *Dubin-Haskell Lining Corp. v. NLRB*, 375 F.2d 568, 571 (4th Cir.1967), *cert. denied*, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968). With these settled principles in mind, we turn to the case at hand.

### A. THE INTERROGATION

■ Questioning or interrogation of employees about their union sentiments is not *per se* unlawful provided such questioning is not coercive. *Standard-Coosa-*

---

**4.** Nueva had recalled Leach to work subsequent to the issuance of the unfair labor practice com-

plaint; Leach declined the recall offer.

*Thatcher Carpet Yarn, Inc., v. NLRB*, 691 F.2d 1133, 1137 (4th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983) (applying *Corrie Corp.* totality of circumstances test to interrogation). In making a determination of coerciveness, this Court must consider a variety of factors including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of the questioning. *Winchester Spinning Corp. v. NLRB*, 402 F.2d 299, 302–303 and n. 1 (4th Cir.1968).

■ Substantial evidence here supports the Board's finding that foreman Brown coercively interrogated employee O'Neill regarding O'Neill's union sympathies. At the time the interrogation took place, Nueva's position on the Union was clear. Vice President Pozzouli had made his speech concerning the consequences of union representation. Brown had followed several employees, including O'Neill, after a union meeting had been cancelled and Leach had recently been laid off. It was in this hostile climate that Brown expressed his negative views on unions and then solicited O'Neill's opinions. O'Neill attempted to defend his position, but Brown interjected that if the union got in, Nueva would "go into a proto shop" and there would be a "big layoff." This open threat of reprisal for union activity underscores the coercive nature of Brown's interrogation. In addition, we note that the interrogation took place in Vice President Pozzouli's office and that Brown was a Nueva official with authority to hire and fire as he saw fit. Furthermore, there was no evidence that Brown explained the purpose of his questioning nor gave O'Neill any assurances against retaliation. Because the Board's finding is supported by substantial evidence, it must be sustained.[5]

5. We thus reject Nueva's characterization of the interrogation as "casual and innocuous." In addition, we reject Nueva's argument that the Board's recent decision in *Rossmore House,* 269 N.L.R.B. 198 (1984), alters the finding of a coer-

### B. THE SPEECH

■ It is well established that an employer violates section 8(a)(1) of the Act if it threatens to close the plant or institute layoffs if its employees select union representation. *NLRB v. Gissell Packing Co.,* 395 U.S. 575, 616–618, 89 S.Ct. 1918, 1941–1942, 23 L.Ed.2d 547 (1969). In *Gissell,* an employer warned employees that the employer was in a "precarious financial condition," that the union would have to strike to achieve its demands and that the probable result would be a plant shutdown. *Id.* at 587–589, 611, 89 S.Ct. at 1926–1927, 1938. The Supreme Court explicitly affirmed the Board's finding that such statements constitute unlawful threats of plant closure because they are not "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control ...." *Id.* at 618, 89 S.Ct. at 1942. The Supreme Court also noted that the question of whether an employer has used coercive language is a question essentially for the expertise of the Board. *Id.* at 620, 89 S.Ct. at 1943.

■ The credited testimony here demonstrates that Vice President Pozzouli made at least one speech to the employees that contained express threats of economic reprisals. Pozzouli warned the employees that if they selected the union, Nueva would reorganize itself into a "prototype shop" and institute massive and permanent layoffs. As previously indicated, these warnings were repeated to employee O'Neill by foreman Brown. Nueva characterizes Pozzouli's recollection of his speech as "informative of the economic situation" and therefore lawful predictions of future economic impact rather than coercive threats.[6] But the ALJ specifically discredited Pozzouli's testimony on this point and, instead, credited the testimony of three employee witnesses whose corroborative testi-

cive interrogation. *Rossmore House* merely articulates a totality of circumstances test, *id.* at p. 4, and that test has been applied here.

6. No copy of the speech was made.

mony showed the coercive nature of Pozzouli's speech. We decline the invitation to second-guess the ALJ's credibility finding. We are convinced that there is substantial evidence that Vice President Pozzouli's speech had the effect of coercing the involved employees from exercising their protected rights. The Board's finding of unlawful threats must therefore be sustained.

### C. THE SURVEILLANCE

It is undisputed that two Nueva supervisors went to the local high school for the purpose of surveilling a scheduled union meeting. It is also undisputed that when no meeting occurred, the supervisors followed three employees to an employee's home, and that one of the supervisors, foreman Brown, later admitted "he was just trying to find the union meeting." Nueva takes the novel position that since the employees were not actually engaged in union activities when they were followed—the union meeting was cancelled without Nueva's knowledge—the supervisor's surveillance could not have interfered with the employee's statutory rights. We think Nueva's argument misses the mark.

■ When an employer watches off duty employees because he believes they are engaged in union activities, the employees may reasonably fear that participation in union activities will result in their identification by the employer as union supporters. An employee, possibly anticipating retaliation against identified supporters, may thereafter feel reluctant to participate in union activities. In our opinion, this coercive tendency exists whether or not the employer actually sees union activity. So long as the employer watches employees believed to be engaged in union activities, the interference with statutory rights will follow. Here, of course, it is undisputed that two Nueva supervisors openly watched and followed employees thought to be on their way to a union meeting. Under these circumstances, we hold that Nueva interfered with the employees' rights regardless of whether union activities actually took place. *See J.P. Stevens*

*& Co., Inc. v. NLRB*, 638 F.2d 676, 683 (4th Cir.1980) ("It is an unfair labor practice for an employer to create in the minds of employees an impression that he is closely observing union organizational activity."). The Board's finding of unlawful surveillance is supported by substantial evidence and must be sustained.

### III.

### SECTION 8(a)(3) VIOLATIONS

■ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it unlawful to discharge a worker because of union activity. The Supreme Court has affirmed, as a uniform standard, that where an employer's opposition to protected activity is shown to be a substantial or a motivating factor in the decision to take adverse action against an employee, the employer will be found to have violated the Act unless the employer is able to demonstrate that the adverse action would have occurred in the absence of the employee's protected conduct. *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 2474–2475, 76 L.Ed.2d 667 (1983); *see NLRB v. Daniel Constr. Co.*, 731 F.2d 191, 197 (4th Cir.1984). In determining whether a section 8(a)(3) violation occurred in this case, there are two crucial inquiries. Was Nueva's decision to terminate employee Leach motivated by anti-union considerations? If so, has Nueva met its burden to show that the termination would have occurred regardless of the forbidden motivations?

■ Turning first to the question of motive, we note that since motive is a question of fact, the Board may infer discriminatory motivation from either direct or circumstantial evidence. *American Thread Co. v. NLRB*, 631 F.2d 316, 321 (4th Cir. 1980); *Neptune Water Meter Co. v. NLRB*, 551 F.2d 568, 569 (4th Cir.1977). Moreover, because motive is a factual determination, the Board's finding must be accepted if supported by substantial evidence on the record as a whole even though this Court may have made a different determination had the issue been before us *de novo*.

*American Thread, supra,* 631 F.2d at 321; *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–488, 71 S.Ct. 456, 463–465, 95 L.Ed. 456 (1951).

■ On August 16, 1982, Brown selected employee Cecilia Leach for layoff. The Board found that Nueva's choice of Leach for layoff was "because of her Union membership and activities." After reviewing the record as a whole, we are convinced the Board's findings are supported by substantial evidence.

The record shows that Leach was a leading union supporter. She spoke out in favor of the union, was one of the first to sign a union authorization card and, on occasion, met with union organizers to discuss and help facilitate the union campaign. The record further shows that during this time, Nueva was acutely aware of the union drive and openly hostile to the union. Foreman Brown singled out Leach for Brown's anti-union rhetoric, repeatedly referring to the "pricken union" in her presence and informing Leach that "the union is not getting in here." In one instance, Brown explicitly warned Leach: "[I]f you don't like working for this Company and you are for all that union business, then why don't you work somewhere else because I don't want no f____g union in here." [7] Leach was selected for layoff several days after this warning and within a week of her meeting with union organizers.

Nueva offers two reasons for its selection of Leach for layoff. Brown's primary justification was that she allegedly refused advancement. Leach had been offered a temporary position as shipping department lead person while the normal lead person took a one-week vacation. Brown testified that he offered the position to Leach because she was the most capable employee in the department. He told Leach that the temporary assignment was not a promotion to a supervisory position, would not include a wage increase and that she would be "in trouble" if she did not meet the shipping quotas. Leach declined the offer. Nueva alternatively argues that Leach was chosen for layoff because she was the highest paid employee in the shipping department. Nueva then concludes that the layoff was valid because Leach was the highest paid, least motivated person in the shipping department. The Board rejected these justifications as "pretextual." We agree.

The record shows that employee Leach, prior to her union involvement, was a valued employee. As the ALJ noted, "by most ordinary standards, ... she would be one of the last employees [Nueva] would want to lose." Leach was the highest paid of the four shipping department employees because she was the most senior and had received two merit wage increases. No other shipping department employee had received a wage increase. Moreover, as the ALJ noted, "it is strange that Foreman Brown would ... select [Leach], his most experienced employee in the department, for layoff at the very time the lead person was on vacation and at a time when [Nueva] was anxious to get a large amount of production shipped."

As the Board noted in rejecting Nueva's proffered justifications as pretextual, Brown never told Leach that the one-week position was an advancement or that declining the offer would adversely affect her employment. To the contrary, he explicitly stated that it was not a promotion and would not include a raise. There is no evidence that Nueva ever reprimanded or laid off other employees who declined similar temporary positions. Furthermore, with respect to Nueva's argument that Leach was chosen because she was the highest paid employee in the shipping department, we adopt the Board's reasoning in rejecting this justification: "[T]his is a *non sequitur.* Under [Nueva's] system, Leach was the highest paid because she was the most capable and able. There is no indication that those employees retained (one of whom had been employed about one month) could have efficiently taken over Leach's work, or saved Respondent any money thereby."

**7.** See footnote 2, *infra.*

Under the circumstances, we conclude that Nueva's discharge of employee Leach was motivated by anti-union considerations and that the Board acted reasonably in rejecting Nueva's proffered justifications as pretextual. We therefore sustain the Board's finding that the termination of Leach violated Section 8(a)(3) and (1) of the Act.

## IV.

### ASSERTED DISCOVERY ERROR

■ At the conclusion of the General Counsel's case, Nueva, citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), moved for an order compelling the General Counsel to produce any information in its files that might exculpate Nueva of liability. The ALJ denied the motion and the Board affirmed. Nueva argues that it was denied due process of law. We find this contention to be without merit.

■ In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (hereinafter referred to as *"Brady"*), the Supreme Court required disclosure of specific exculpatory materials to afford special protection to criminal defendants who face penal sanctions if convicted. *Id.* at 87, 83 S.Ct. at 1196. The particular item which the prosecution had in *Brady* was a statement of a co-defendant acknowledging that he had done the actual killing. *Id.* at 84, 83 S.Ct. at 1195. The Supreme Court held this suppression to be a denial of due process. In our opinion, the *Brady* disclosure rule is not applicable to Board proceedings. First, we do not accept Nueva's analogy between criminal prosecution and an unfair labor proceeding. An action for violations of the National Labor Relations Act is civil in nature, does not involve potential incarceration and violation of the Act does not carry with it the stigma of a criminal conviction. Second, acceptance of Nueva's *Brady* argument would undermine the strong policy of confidentiality regarding witness testimony and thus impermissibly interfere with the Board's enforcement proceedings. *See NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978). Finally, we note that the Board and the courts have consistently denied similar requests for disclosure of exculpatory material in unfair labor practice proceedings. *See NLRB v. Brookwood Furniture,* 701 F.2d 452, 469 (5th Cir.1983); *North American Rockwell Corp. v. NLRB,* 389 F.2d 866, 873 (10th Cir.1968); *Magic Pan, Inc.,* 242 NLRB 840, 841 (1979); *Erie County Plastics Corp.,* 207 NLRB 564, 570 n. 29 (1973).[8] Accordingly, we find *Brady* inapposite and hold that the ALJ properly denied Nueva's demand for exculpatory materials.

## V.

### CONCLUSION

For the foregoing reasons, the petition for enforcement is granted.

**ENFORCEMENT GRANTED.**

---

**8.** Nueva's reliance on *Drukker Communications, Inc. v. NLRB,* 700 F.2d 727 (D.C.Cir.1983), in this regard is misplaced. In *Drukker,* the question was whether the employer and the union had reached a certain agreement during a meeting attended by a Board agent. Employer and union witnesses disagreed as to what occurred during the meeting. The court, disagreeing with the Board, held that the employer could subpoena the Board agent to testify as to the events occurring at the meeting. Thus, *Drukker* did not involve a motion for production of exculpatory materials. Furthermore, as the D.C. Circuit emphasized, the employer in *Drukker* was seeking specific information from a specific witness about a specific event and contrasted the request to "more generalized 'fishing expeditions' for helpful evidence which have uniformly been rejected." *Id.,* 700 F.2d at 732.