NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL UNION 1058, UNITED MINE
WORKERS OF AMERICA; Local Un-
ion 1501, United Mine Workers of
America; Local Union 1570, United
Mine Workers of America; Local Un-
ion 1829, United Mine Workers of
America; Local Union 1938, United
Mine Workers of America; Local Un-
ion 1949, United Mine Workers of
America; Local Union 9909, United
Mine Workers of America, Respon-
dents.

No. 91–3034.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 29, 1991.

Decided Feb. 26, 1992.

Robert James Englehart, N.L.R.B.,
Washington, D.C., argued (Jerry M. Hunt-
er, Gen. Counsel, D. Randall Frye, Acting
Deputy Atty. Gen., Aileen A. Armstrong,
Deputy Associate Gen. Counsel, Collis Su-
zanne Stocking, Supervisory Atty., William
R. Stewart, on brief), for petitioner.

James Morrison Haviland, McIntyre,
Haviland & Jordan, Charleston, Va., ar-
gued (Barbara Evans Fleischauer, Fair-
mont, W.Va., on brief), for respondents.

Before HALL and MURNAGHAN, Circuit Judges, and HARVEY, Senior District Judge for the District of Maryland, sitting by designation.

## OPINION

K.K. HALL, Circuit Judge:

The National Labor Relations Board (NLRB or Board) petitions for enforcement of its order finding that respondents, seven local unions of the United Mine Workers of America (UMW), violated § 8(b)(1)(A) of the National Labor Relations Act. We deny enforcement.

### I.

#### A.

A synopsis of background facts is necessary to understand this case in context.

This case arises from intraunion jealousies and bickering. In early 1988, Dowl Johnston, Dale Woodrum, and Benny Moore were all employed at BethEnergy Mine 81 in Nicholas County, West Virginia. Woodrum was the lamphouse man, and Moore the Chairman of the mine's Safety Committee. Johnston served on the UMW District 31 executive committee, but was laid off this union position at the time. The employees of Mine 81 were represented by UMW Local 2059.

In January 1988, Woodrum and Johnston filed intraunion charges against Moore. They alleged that Moore had embezzled union funds. On February 29, 1988, a trial board dismissed the charges as unfounded. The incident caused rumors and speculation among local miners that Woodrum and Johnston had concocted the accusation to try to force Moore from his safety committee position.

On the morning of February 26, while the embezzlement allegations against Moore were still pending, the disputants had an altercation at the mine. Just days earlier, a federal inspector had cited the mine for storing gasoline in the lamphouse. Moore, unaware that the gasoline had since been removed, approached the lamphouse, where Woodrum was smoking a cigarette. Moore told Woodrum to put out the ciga-

rette. Instead of explaining that the gasoline was no longer there, Woodrum puffed dramatically on the cigarette while turning a lighter off and on.

A verbal altercation replete with a stream of profanity ensued. Things quickly calmed down, however, and Moore left the area briefly, still unaware that the gasoline was not in the lamphouse.

Johnston had arrived at the lamphouse in time to witness at least some of the altercation. He knew that Woodrum was tricking Moore, but said nothing. Later, when Moore returned to the lamphouse, Johnston accosted him about the things he had said to Woodrum, and an even more heated exchange followed. Physical threats were exchanged.

Johnston went to BethEnergy's foreman and demanded that something be done about Moore. The company obligingly discharged Moore for using profanity; Woodrum and Johnston were not disciplined.

Moore filed a grievance, and a hearing was held before an arbitrator on March 8–9, 1988. Johnston testified against Moore. On March 20, the arbitrator issued a decision reinstating Moore without back pay. The arbitrator emphasized his finding that Woodrum and Johnston had instigated the incident and were thus at least as much, if not more, at fault as Moore. Inasmuch as the company had not disciplined Johnston and Woodrum, Moore had to be reinstated, even though his behavior standing alone warranted some discipline.

The arbitrator's decision, coming as it did on the heels of the dismissal of Johnston and Woodrum's embezzlement charge against Moore, was big news among miners in District 31. On April 17, a pro-union political rally was held at Monongah, West Virginia. Many District 31 miners attended, but so did other unionized workers and numerous state and local political candidates.

#### B.

We now reach the facts directly relevant to the case before us.

Carlo Tarley, president of respondent Local 1501, attended the Monongah rally and

brought a written intraunion charge he had prepared on April 11, 1988. It is addressed to the Secretary/Treasurer of District 31, and reads:

Pursuant to Article 16 of the UMWA International Constitution, *Trials of District and International Officers,* we, the following named members and officers, do hereby charge Dowl Johnston, a Subdistrict 4 Board Member of District 31, with the following violations: 1) violating his oath as a UMWA member, 2) violating his oath of office as a District Officer, and 3) violating Article 12 of the International Constitution.

Dowl Johnston did conspire and work with the management of Beth–Energy # 81 mine in an attempt to have a mine and safety committeeman of Local 2059, Benny Moore, removed from office and subsequently terminated from his employment at Beth–Energy Mine # 81. The above violations and actions occurred in January 1988 and continued through March 9, 1988.

We, the undersigned Local Union Members of District 31, do hereby certify that the above actions were committed by Dowl Johnston and that the dates of occurrence are true to the best of our knowledge.

Significantly for later events, the time frame of this charge includes Johnston's testimony before the arbitrator. Tarley signed the charge himself and obtained the signatures of six others at the rally. They were: Charles Chefren, president of Local 9909; James Shiflett, president of Local 1938; Thomas Turpin, president of Local 1058; Larry Knisell, president of Local 1570; John Pennington, who was either recording secretary or president of Local 1829; and Allen Reeves, chairman of the mine committee for Local 1949. None of the seven is a member of Local 2059, which represents Johnston, Moore, and Woodrum. The seven simply signed their names; the document does not mention their offices or local affiliations.

### C.

On June 7, 1988, Dowl Johnston filed unfair labor practice charges against District 31 and the seven locals to which the signatories belonged. The NLRB issued a complaint on July 15. In September, Johnston filed an additional charge against the UMW International; on October 28, the NLRB amended its complaint to add the new party. The charges were heard by an administrative law judge (ALJ) on February 9–10, 1989. On October 25, 1989, the ALJ issued his decision. He found that, if the seven signatories had acted as agents of their respective locals in bringing the charge against Johnston, the locals had violated § 8(b)(1)(A) of the Act. However, the ALJ found that the seven had not acted as agents, and the charges against the locals, as well as the district and international unions, were dismissed.

The NLRB reversed as to the locals. The Board ruled that, although the ALJ had considered the proper factors in determining the question of agency, he had reached the wrong conclusion. The Board found that the facts relied on by the ALJ did not "compel overriding the persuasive and substantial evidence of agency derived from the signatories' holding of elective office within their locals. These officers had apparent authority to act for their locals, and they were acting within the scope of that apparent authority." On the other hand, the Board affirmed the dismissal of charges against the district and international unions. The Board ordered the locals to withdraw the intraunion charge against Johnston, expunge records, "cease and desist" from the violation, and to make Johnston whole for any losses he incurred on account of the intraunion charge.

The locals resist the order, and the NLRB has petitioned for enforcement. The findings of the NLRB are conclusive if they are supported by substantial evidence. *NLRB v. Nueva Engineering, Inc.,* 761 F.2d 961, 965 (4th Cir.1985). The ground upon which the NLRB reversed the ALJ's decision—agency—is the central object of our inquiry.

### II.

Section 8(b)(1)(A) of the National Labor Relations Act is the key provision at issue:

It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7; *Provided* that this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; ....

■ We agree with the ALJ and NLRB that union discipline of an employee for testifying at an arbitration violates § 8(b)(1)(A), notwithstanding the "acquisition and retention" proviso. *NLRB v. Local 745, Int'l Union of Electrical, Radio and Machine Workers*, 759 F.2d 533 (6th Cir.1985). The preference for arbitration would be greatly frustrated if witnesses were intimidated from testifying truthfully by fear of intraunion retaliation. Moreover, there is substantial evidence in the record to support the ALJ's finding that the disciplinary charge would not have been brought without Johnston's testimony against Moore.

### III.

■ We thus reach the central issue of agency. Though retaliatory discipline by the union is an unfair labor practice, an individual employee cannot violate § 8(b)(1)—it only prohibits certain actions of a "labor organization or its agents." Therefore, unless the bringing of the charges against Johnston was the act of respondent locals or their agents, we should deny enforcement. The ALJ and NLRB reached different conclusions on this issue.

Section 2(13) of the Act provides that actual authority is not determinative of agency:

In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

■ This provision simply incorporates the common law of agency, including the concepts of implied[1] and apparent authority. *Mullett v. NLRB*, 571 F.2d 1292 (4th Cir.1978). The ALJ cited a 1988 NLRB case, which elaborates on the meaning of "apparent authority":

Apparent authority is created through a manifestation by the principal to a third party that supplies a reasonable basis for the latter to believe that the principal has authorized the alleged agent to do the acts in question. *NLRB v. Donkin's Inn*, 532 F.2d 138 (9th Cir. 1976); *Alliance Rubber Co.*, 286 NLRB No. 57, at 4, fn. 4 (Sept. 30, 1987). Thus, either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or the principal should realize that this conduct is likely to create such a belief. *Restatement 2d, Agency*, § 27 (1958, Comment). Two conditions, therefore, must be satisfied before apparent authority is deemed created: (1) there must be some manifestation by the principal to a third party, and (2) the third party must believe that the extent of the authority granted to the agent encompasses the contemplated activity.

*Service Employees Local 87 (West Bay Building Maintenance)*, 291 NLRB No. 11 (1988). In this case, the Board failed to cite *Service Employees* or even to make the two-step analysis it requires. The Board simply concluded that the signatories' status as elected officers gave them the apparent authority to file intraunion charges on behalf of their respective locals.

The signing individuals clearly did not have the actual authority to file charges on behalf of their locals. Only a "member" (and not a local union) may bring a charge against a district officer like Johnston.

---

1. Implied authority is actual authority, intended by the principal to be granted and understood by the agent to be within his powers. It differs from express authority only in the manner (inference or deduction from surrounding circumstances) by which it is proved. *See generally*, 3 Am.Jur.2d *Agency* § 75 (1986). The Board does not allege that the respondent locals intended that the signatories have the actual authority to file intraunion charges on the respondents' behalf, or that any of the signatories believed he had such authority. Hence, implied authority is not an issue in this case.

UMW Constitution, art. 16, § 1. On the other hand, endorsement by a district executive board or ten local unions is required for a "member" to bring charges against an International officer. *Id.*, § 2. Five of the seven individuals were indeed presidents of their respective unions, but they do not have the sort of concentrated executive power commonly exercised by the president of a governmental or corporate entity.[2] Under the UMW Model By-Laws (which every local involved has adopted), the president of the local may only perform the most routine tasks without approval of the Executive Committee. Any official written action of a local union is generally embossed with the seal of the local, which is in the custody of the recording secretary.

The Board's finding thus depends on the "apparent authority" of the seven signing officers. Under common law and the Board's own test, the focus of this inquiry is on the principal—that is, the local union—rather than the supposed agent. Unless the local unions made some manifestation to the third party—Johnston—that would cause him to believe that the locals had given authority to their officers to sign the charge, the apparent authority argument fails.

 The intraunion charge itself is not supportive of the "apparent authority" finding. It does begin, "we, the following named members *and officers*," but it ends referring to the signatories as mere "members." Moreover, no signatory is identified as the officer of any entity—in other words, the principal's authority is not invoked. Moreover, even if it were, the agent cannot create his own apparent authority.

There is nothing to indicate that Johnston, who, as a district officer, should have been aware that charges could only be leveled at him by "members," was misled by any "manifestation" from any of the respondent local unions into believing that they had authorized the signatories to bring the charge on behalf of the locals.

The NLRB's opinion reversing the ALJ ignores the law of agency and applies basi-

cally a *per se* rule of apparent authority for any actions by a union officer, no matter how circumscribed the officer's actual authority, notwithstanding the absence of any acts on the part of the principal that would create an impression of broader "apparent authority," and in disregard of whether the complaining third party knows of the limits of the agent's actual authority.

Because the record is void of evidence that the respondent locals made any manifestation to Johnston, or that Johnston believed that the persons who signed the intraunion charges had the authority to do so in their official capacities, the NLRB's finding that the respondents violated the Act is not supported by substantial evidence.

We deny enforcement.

ENFORCEMENT DENIED.

---

2. Pennington (recording secretary) and Reeves (chairman of the mine committee) held lesser executive posts; the NLRB did not articulate how the vaunted position of recording secretary carried with it the apparent authority to unilaterally act on behalf of a union.