**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                                  No. 96-1990

GRAND CANYON MINING COMPANY,
Respondent.

GRAND CANYON MINING COMPANY,
Petitioner,

v.                                                                  No. 96-2089

NATIONAL LABOR RELATIONS BOARD,
Respondent.

On Application for Enforcement and Cross-Petition for
Review of an Order of the National Labor Relations Board.
(11-CA-15801, 11-CA-16059)

Argued: May 7, 1997

Decided: June 27, 1997

Before MURNAGHAN and MOTZ, Circuit Judges, and
STAMP, Chief United States District Judge for the
Northern District of West Virginia, sitting by designation.

_____

Order enforced by published opinion. Judge Murnaghan wrote the
opinion, in which Judge Motz and Chief Judge Stamp joined.

_____

**COUNSEL**

**ARGUED:** Jeffrey Lawrence Horowitz, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Petitioner. Matthew
Woodruff Sawchak, SMITH, HELMS, MULLISS & MOORE,
L.L.P., Raleigh, North Carolina, for Respondent. **ON BRIEF:** Freder-
ick L. Feinstein, General Counsel, Linda Sher, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
Howard E. Perlstein, Deputy Assistant General Counsel, NATIONAL
LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.
George J. Oliver, SMITH, HELMS, MULLISS & MOORE, L.L.P.,
Raleigh, North Carolina, for Respondent.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The National Labor Relations Board (the "Board") found that
Grand Canyon Mining Company ("Grand Canyon") violated sections
8(a)(1) and 8(a)(3) of the National Labor Relations Act (the "Act"),
29 U.S.C.A. § 158(a)(1), (3) (West 1973 & Supp. 1997), by making
several threats and coercive statements to its employees when they
attempted to unionize and by discharging and constructively discharg-
ing two of its employees in retaliation for their unionizing activities.
The Board has petitioned for enforcement of its order, and Grand
Canyon has cross-petitioned for review of the Board's order. For the
reasons stated below, we enforce the Board's order in full.

I.

Rapoca Energy Company owns the mine at issue in the instant
case, and it leased its coal mining rights to Sam Blankenship in Octo-
ber 1990. Blankenship then assigned his mining rights to Grand Can-
yon. Gary Horn owns and operates Grand Canyon. Horn employs
several people in supervisory positions. Bill Sawyers works as Grand
Canyon's superintendent, and he is responsible for running the mine.
Elmer McCoy, Jr. and Larry Addair work as the foremen of sections
one and two of the mine, respectively, and they are responsible for

2

overseeing the day-to-day operations of their sections. Doug Wright no longer works for Grand Canyon, but at the time at issue in the instant case, he worked as a supervisor in section two of the mine. Tim Woods works as a miner, but he also occasionally works as a short-time fill-in supervisor for Wright.

In July 1991, Grand Canyon began mining coal out of section one of the mine. When Grand Canyon began mining section two in late 1991, problems soon developed. The coal seam in section two is smaller and has a lower overall quality than the coal in section one, and section two is not structurally sound. Those problems caused Grand Canyon to shut down operations in section two periodically. In June 1992, Grand Canyon closed section two for six months. In June 1993, it closed the section for two weeks. Each time, Grand Canyon laid off employees during the shutdown.

Ron Casteel worked as a roof bolter for Grand Canyon. In September 1993, he decided to try and unionize the mine, and he began talking to his fellow employees. The employees held meetings regarding possible unionization on October 31, 1993 and November 7, 1993. As a result of those meetings, several employees signed cards that authorized the United Mine Workers of America (the "UMWA") to represent them. Larry French, a roof bolter, attended both meetings and signed an authorization card. On December 17, 1993, the UMWA delivered a union election petition to Grand Canyon owner Gary Horn.

Several Grand Canyon employees claim that various Grand Canyon supervisors made threats throughout November 1993 that Grand Canyon would close the mine if the employees supported the union, made threats that Grand Canyon would lay off any employee that supported the union, and gave the impression that Grand Canyon was conducting surveillance of union activities. On November 16, 1993, Grand Canyon transferred Casteel, the union organizer, from section one to section two of the mine. Five days later, Grand Canyon shut down section two and laid off most of its section two employees, including Casteel (the "November 1993 layoff"). On February 22, 1994, supervisor Woods accused Larry French of being a union instigator. Three days later, Grand Canyon transferred French from the day shift in section one to the night shift. French protested because

3

he depended on his brother for transportation, and his brother worked on the day shift at Grand Canyon. Nonetheless, Grand Canyon transferred French to the night shift, and French subsequently quit his job.

The UMWA filed two separate charges against Grand Canyon with the Board. On July 21, 1994, the Board's General Counsel issued a consolidated complaint. An administrative law judge ("ALJ") held hearings on October 19 and 20, 1994 and issued a decision on April 17, 1995. The ALJ dismissed several of the claims that the General Counsel had alleged. However, the ALJ found that Grand Canyon violated sections 8(a)(1) and 8(a)(3) of the Act by making threats of closure, by giving the impression of union surveillance, by stating that it laid off two workers because of their union sympathies, by transferring and subsequently laying off Ron Casteel, and by constructively discharging Larry French. The ALJ's recommended order requires Grand Canyon to cease and desist from the unfair labor practices found and from otherwise interfering with, restraining, or coercing employees in the exercise of their rights to unionize. The order also directs Grand Canyon to rescind the unlawful transfer and layoff of Casteel and the unlawful constructive discharge of French. It further directs Grand Canyon to offer Casteel and French full reinstatement to their former positions, or to substantially similar positions if their former jobs no longer exist, to make them whole for any losses resulting from the unlawful activity, and to expunge Casteel's and French's records of all references to the transfer, layoff, and constructive discharge. Finally, the order requires Grand Canyon to post an appropriate notice regarding its foregoing responsibilities.

The Board affirmed the ALJ's findings and conclusions, and it adopted the ALJ's order. The Board now applies for enforcement of its order against Grand Canyon, and Grand Canyon cross-petitions for review of that order.

II.

We must affirm the Board's factual findings as long as they are supported by "substantial evidence on the record as a whole." Vance v. NLRB, 71 F.3d 486, 489 (4th Cir. 1995). "Substantial evidence" means:

4

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." It is "more than a scintilla but less than a preponderance." Although a reviewing court accords "due deference" to the Board's factual findings under the substantial evidence standard of review, the court does not "mechanically accept[ ]" those findings.

Id. at 489-90 (alteration in original) (citations omitted). We "may not `displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" NLRB v. Walton Mfg. Co., 369 U.S. 404, 405 (1962) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). See also NLRB v. Daniel Constr. Co., 731 F.2d 191, 193 (4th Cir. 1984) ("If the findings of the Board have substantial support in the record as a whole, our inquiry ends and its order must be enforced even though we might have reached a different result had we heard the evidence in the first instance."). We must affirm the Board's application of the law to those facts as long as its application is "reasonable and consistent with the [Act]." Vance, 71 F.3d at 490.

III.

Section 7 of the Act, 29 U.S.C.A. § 157 (West 1973), guarantees employees "the right to self-organization, to form, join, or assist labor organizations." Section 8(a)(1) of the Act, 29 U.S.C.A. § 158(a)(1) (West 1973 & Supp. 1997), implements that guarantee and makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their section 7] rights." To establish a violation of section 8(a)(1), the Board's General Counsel must establish that, under all of the circumstances, the employer's conduct may reasonably tend to coerce or intimidate employees. See Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1137 (4th Cir. 1982); NLRB v. P.B. & S. Chem. Co., 567 F.2d 1263, 1267 (4th Cir. 1977). Whether particular conduct is coercive is a "question essentially for the specialized experience of the NLRB." Daniel Constr. Co. v. NLRB, 341 F.2d 805, 811 (4th Cir. 1965).

A.

We have clearly held that an employer violates section 8(a)(1) if it threatens to close its business if its employees support a union. See

NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 966 (4th Cir. 1985). In the instant case, the Board found that supervisor Wright and foreman Addair told various employees on at least two different occasions that Grand Canyon would close the mine if the employees supported the UMWA.

Substantial evidence supports the Board's finding that supervisor Wright made such a statement. The unrebutted testimony at the administrative hearing established that in mid-November 1993, supervisor Wright told a group of employees that Grand Canyon would close the mine if they supported the UMWA. Troy Salyers, a Grand Canyon employee, testified to a conversation that he and his fellow employees Mike Richardson and Eddie Fuller had with supervisor Wright. Salyers testified that "somehow or another it come up about the union and Doug [Wright] said that they'd just shut it down. He said they'd just shut it down for a year and then open it back up." In response to a question on direct examination regarding what Wright specifically said about the union, Salyers replied that "Doug [Wright] said something about they was going to work us out of a job or something like that." Grand Canyon did not call supervisor Wright to testify, nor did it offer any other evidence to refute Salyers's testimony. Thus, the Board did not err in crediting Salyers's testimony and finding that supervisor Wright did in fact make such a statement.

Substantial evidence also supports the Board's finding that foreman Addair made a similar statement. Donis Cook, a Grand Canyon employee, testified that foreman Addair told him that Blankenship had said that Grand Canyon would close the mine if the employees unionized and just reopen it later. Specifically, Cook testified that in mid-November 1993, Addair said that "`Sam [Blankenship] will not work under a union. He will shut it down for a couple of months and then he will start right back up.'" Addair also testified, and he denied that he made such a statement to Cook. The ALJ, however, credited Cook over Addair because Cook's testimony convinced the ALJ that Cook "was a truthful witness who candidly reported only what he had heard." We generally must defer to the Board's credibility resolutions. See Daniel Constr. Co., 341 F.2d at 812 ("[I]t is the responsibility of the Board, and not this court, to resolve factual conflicts in the testimony and questions of the credibility of witnesses."). We find no basis for reversing the Board's credibility resolutions.

6

Grand Canyon argues that there is insufficient evidence that Blankenship actually made that statement to Addair. However, Grand Canyon misunderstands the nature of the coercive statements. Addair's statement to Cook that the mine would close was a threat, regardless of whether Blankenship actually told Addair that he would close the mine because of union support. The impact of Addair's statement on Cook is significant, whether or not Addair's statement was true. See NLRB v. Gissel Packing Co., 395 U.S. 575, 616-18 (1969). Even if Blankenship did not make the statement to Addair or did not actually intend to close the mine because of union support, Cook would reasonably feel intimidated by Addair's statement. See Coradian Corp., 287 N.L.R.B. 1207 (1988) (finding statement regarding plant closure unlawful despite lack of a factual basis for predicting a plant closure).

Thus, substantial evidence supports the Board's findings that Grand Canyon's supervisors made threats that the company would close if the employees supported the UMWA. Substantial evidence also supports the Board's finding that the supervisors' statements could tend to coerce or intimidate the involved employees. See Nueva Eng'g, 761 F.2d at 966-67.

B.

We have held that an employer violates section 8(a)(1) of the Act if it gives employees the impression that it is conducting surveillance of their union activities. See Nueva Eng'g, Inc., 761 F.2d at 967; J.P. Stevens & Co. v. NLRB, 638 F.2d 676, 683-84 (4th Cir. 1980); Filler Prods., Inc. v. NLRB, 376 F.2d 369, 374-75 (4th Cir. 1967). The Board in the instant case concluded that supervisor Wright unlawfully gave employee Cook the impression that Grand Canyon had conducted surveillance of a past union meeting.

Substantial evidence supports the Board's finding. Cook testified as follows:

> Doug [Wright] asked me when we were going to strike or when were we going to sign the cards.
>
> I said, "I don't know what you are talking about."

7

He said, "You know what I am talking about. There was sixteen of you at the meeting. Junior [foreman McCoy] saw you all up there. I know there was sixteen of you at the meeting."

Cook testified that Wright made those statements approximately one week after the second union meeting on November 7, 1993. Grand Canyon did not present any testimony or other evidence to refute Cook's testimony. Thus, substantial evidence supports the Board's finding that supervisor Wright did indeed make such a statement to Cook.

Substantial evidence also supports the Board's finding that Wright's statement unlawfully created an impression of union surveillance. Grand Canyon argues that "an isolated comment" can not violate the Act because it does not suggest "ongoing surveillance." However, several courts have held that one comment can indeed violate the Act as long as the comment gives the employee the impression that the employer has engaged in union surveillance. See, e.g., NLRB v. Rich's of Plymouth, Inc., 578 F.2d 880, 884-85 (1st Cir. 1978) (holding that a single remark created the impression of union surveillance). An employer's reference to general facts that it has heard, or its reference to known facts that an employee is a union activist do not necessarily create an impression of intentional union surveillance. See NLRB v. Pilgrim Foods, Inc. , 591 F.2d 110, 113-14 (1st Cir. 1978) (holding that a single remark did not create the impression of union surveillance where the employer only acknowledged that the employee was a union activist and did not refer to any specific union meeting); Clark Equip. Co., 278 N.L.R.B. 498 (1986) (reversing the ALJ's finding and concluding that a supervisor's statement that he had heard that very few people attended a union meeting did not create the impression of union surveillance because the supervisor only referred to general or known facts that he had "heard"). However, a supervisor's statement, as in the instant case, that another supervisor actually watched a specific union meeting and his reference to specific facts regarding the number of employees in attendance at the meeting clearly could give a reasonable employee the impression that the employer had conducted surveillance of union activities. See Nueva Eng'g, 761 F.2d at 967 ("So long as the employer watches employees believed to be engaged in union activi-

8

ties, the interference with statutory rights will follow."); Gupta Per-mold Corp., 289 N.L.R.B. 1234 (1988) (affirming the ALJ's finding that a supervisor's statement that he knew that thirteen employees had attended the union meeting the previous day created the impression of union surveillance); Link Mfg. Co., 281 N.L.R.B. 294 (1986) (reversing the ALJ's finding and concluding that a supervisor's questions to an employee regarding how a union meeting had gone the previous day and his statement that he knew that thirty-six employees had signed union cards created the impression of surveillance), enforced, 840 F.2d 17 (6th Cir. 1988). The employer's statement need only contain sufficiently specific information to convey the impression that the employer or its agents has conducted union surveillance.[1] Thus, substantial evidence supports the Board's finding that Grand Canyon violated section 8(a)(1) of the Act by creating the impression of union surveillance.

C.

The Board found that a few days after the November 1993 layoff in section two, foreman McCoy told employee James French that his fellow employees had been laid off because of their union activities. Substantial evidence supports the Board's finding that McCoy did indeed make such a statement. French testified that McCoy told him that "he [McCoy] heard [superintendent] Bill Sawyers say that morning that the reason that the men were laid off in Section 2 was because Ronnie Casteel and Dennis Dutton were talking union." McCoy denied that he made such a statement. The ALJ, however, credited French's testimony because he found French to be "a credible witness who testified in a forthright manner and who remains an employee of the Company, with the corresponding likelihood that he would not be motivated to testify adversely to the Company unless his testimony

_____

[1] Although the evidence is not clear regarding how many employees actually attended the second union meeting that Wright referred to, it appears that Wright's reference to sixteen employees was not too far off. Whether Wright was completely accurate in his statement regarding the number of employees in attendance does not, as Grand Canyon argues, control the case. Rather, it is enough that Wright's statement was accurate enough to lead Cook to believe that Grand Canyon had conducted surveillance of the meeting.

9

was true." As already indicated, we generally must defer to the Board on issues of credibility and the resolution of factual disputes. See Daniel Constr. Co., 341 F.2d at 812. Thus, substantial evidence supports the Board's finding that McCoy did indeed make such a statement.

Substantial evidence also supports the Board's finding that McCoy's statement violated section 8(a)(1) of the Act. A supervisor's explicit statement to an employee that the company laid off his fellow employees because of their union activities reasonably could coerce or intimidate the remaining employees.

Grand Canyon, however, contends that this conclusion is inconsistent with the Board's finding that the November 1993 layoff was lawful.[2] However, no such inconsistency exists. Even if Grand Canyon had a legitimate business justification for the November 1993 closure and subsequent layoff, a supervisor's intentionally misleading statement to an employee about the reason for the layoff could still constitute a coercive statement. We must focus not on the ultimate truth of the employer's statement, but on the impression that the statement leaves on the reasonable employee. See NLRB v. Gissel Packing Co., 395 U.S. 575, 616-18 (1969). Thus, since McCoy's statement could tend to coerce or intimidate a reasonable employee, we conclude that the Board did not err in finding that McCoy's statement violated section 8(a)(1) of the Act.

IV.

Section 8(a)(3) of the Act, 29 U.S.C.A. § 158(a)(3) (West 1973 & Supp. 1997), makes it unlawful for an employer to discharge an employee because of the employee's union activity. Specifically, section 8(a)(3) provides that an employer may not discriminate "in regard to hire or tenure of employment or any term or condition of employment to . . . discourage membership in any labor organization." Id.

_____

[2] The Board found that Grand Canyon did not actually close section two in order to retaliate against employees who had engaged in union activities. The Board found that Grand Canyon legitimately closed section two and laid off the section two employees for economic reasons.

10

A.

On November 16, 1993, Grand Canyon transferred Ronald Casteel from section one of the mine to section two of the mine. Two or three days later, Grand Canyon made the final decision to close section two, and Grand Canyon laid Casteel off, along with the rest of the section two employees, on November 21, 1993. As noted above, the Board found that Grand Canyon closed section two for legitimate economic reasons and that the November 1993 layoff itself was lawful. However, the Board concluded that Grand Canyon transferred Casteel to section two because of his union activities so that it could then lay him off as part of the otherwise appropriate November 1993 layoff.

In order to establish a prima facie case of unlawful discharge under section 8(a)(3), the Board's General Counsel must establish by a preponderance of the evidence: 1) that the employee was engaged in protected union activity; 2) that the employer was aware of the employee's union activity; and 3) that the employee's union activity was a substantial or motivating reason for the employer's adverse employment action. See FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995). The Board may infer discriminatory motive from either direct or circumstantial evidence. See NLRB v. Nueva Eng'g, Inc., 761 F.2d 961, 967 (4th Cir. 1985). Since motive is a factual question, we must accept the Board's finding as long as the finding is supported by substantial evidence on the record as a whole, even though we would independently decide the issue differently. Id.

If the Board's General Counsel establishes a prima facie case, the burden then shifts to the employer to prove affirmatively that it would have made the same decision even in the absence of the employee's union activities. See FPC Holdings, Inc., 64 F.3d at 942. However, even if the employer asserts a nondiscriminatory reason for its action, the Board may still reject the proffered reason as a pretext and find that the employer violated section 8(a)(3). See NLRB v. Low Kit Mining Co., 3 F.3d 720, 728 (4th Cir. 1993). We must affirm the Board's finding of pretext as long as it is supported by substantial evidence. Id.

In the instant case, the Board's General Counsel clearly established the first element of the prima facie case. Casteel undisputedly was

11

engaged in union activity. He originally contacted UMWA's representatives and told them that the Grand Canyon employees wanted to meet with them, he set up union meetings with employees, and he drafted and circulated a handwritten letter supporting the UMWA to his fellow employees.

Substantial evidence also supports the Board's conclusion that Grand Canyon knew about Casteel's union activity before it transferred him to section two. As noted above, supervisor Wright told several employees the day before Grand Canyon transferred Casteel to section two that he knew that sixteen employees had attended the last union meeting and that foreman McCoy had seen the sixteen employees at the meeting. Moreover, as discussed above, foreman McCoy told several employees a few days after the transfer that Grand Canyon laid Casteel off because he had been "talking union." Grand Canyon correctly points out that no evidence in the record directly establishes that Grand Canyon knew about Casteel's union activity before the transfer. However, the Board may infer the employer's knowledge of the employee's union activity from the facts and circumstances surrounding the employer's actions. See FPC Holdings, Inc., 64 F.3d at 943; NLRB v. Pilgrim Foods, Inc., 591 F.2d 110, 118 (1st Cir. 1978). The statements that supervisor Wright and foreman McCoy made provide substantial evidence from which the Board could infer that Grand Canyon knew about Casteel's union activity before it transferred him to section two.

Finally, substantial evidence supports the Board's conclusion that anti-union animus was a substantial or motivating reason for Grand Canyon's decision to transfer Casteel to section two. For example, employee Dutton testified that foreman McCoy told him a few days before Grand Canyon transferred Casteel "that if [Casteel] didn't hush, that they was going to get rid of him." Grand Canyon did not present any evidence to refute Dutton's testimony. Moreover, Grand Canyon witnesses testified that the company made the final decision to close section two on November 18 or 19, 1993, only two or three days after Grand Canyon had transferred Casteel to section two. At the time that Grand Canyon transferred Casteel, it must have known that an imminent shutdown was very likely. Thus, the timing of the transfer also supports the Board's conclusion of unlawful motive. See FPC Holdings, Inc., 64 F.3d at 943-44 (holding that the timing of the

12

layoff in question raised the inference that anti-union animus motivated the layoffs). Finally, the contemporaneous section 8(a)(1) violations discussed above provide further evidence that Grand Canyon's employment decision was motivated by anti-union animus. See id. at 944 (holding that a finding of unlawful motivation may be based on the "timing of discharges, [the] selection of two prime movers of [the] union drive for termination, and manifestations of hostility through other Section 8(a)(1) violations"); NLRB v. Daniel Constr. Co., 731 F.2d 191, 197-98 (4th Cir. 1984) (holding that contemporaneous section 8(a)(1) violations provide evidence of an employer's anti-union animus in the discharge of a particular employee). Thus, the specific circumstances surrounding Casteel's transfer and Grand Canyon's widespread violations of section 8(a)(1) during the same time frame provide substantial evidence for the Board's conclusion that anti-union animus was a motivating or substantial factor in Grand Canyon's decision to transfer Casteel to section two. The Board's General Counsel therefore established a prima facie case of a section 8(a)(3) violation.

Grand Canyon asserted a legitimate, nondiscriminatory reason for Casteel's transfer. Superintendent Sawyers testified that at the time of the transfer, Grand Canyon was doing work in section one that required timbers to support the roof rather than roof bolts. Sawyers testified that he thought another employee in section two "would be a better timber man and Mr. Casteel would be the better roof bolter operator." Sawyers therefore transferred the section two employee to section one to set timbers in section one, and he transferred Casteel to section two, allegedly to install roof bolts in section two.

However, substantial evidence supports the Board's conclusion that Grand Canyon's asserted justification for the transfer was a pretext. For example, the record reveals, and Grand Canyon concedes, that it rarely, if ever, transfers employees from one section of the mine to the other. The fact that Grand Canyon decided to shut section two down only two to three days after it transferred Casteel reinforces the Board's finding of pretext. Thus, we conclude that substantial evidence supports the Board's finding that the real motive for Casteel's transfer was anti-union animus. See Perel v. NLRB, 373 F.2d 736, 737 (4th Cir. 1967) (holding that the employees' evidence balanced against the employer's nondiscriminatory reasons raised "a question

13

of fact as to the real motive for the discharges which the expertise of the Board is peculiarly suited to determine, and where its findings are supported by both direct and circumstantial evidence, this court should not substitute its judgment for that of the Board").

We therefore hold that substantial evidence supports the Board's finding that Grand Canyon violated sections 8(a)(1) and 8(a)(3) of the Act when it transferred and subsequently laid Casteel off.

B.

Larry French, a roof bolter, worked on the day shift in section one of the mine. He attended both union meetings and signed an UMWA authorization card. On February 25, 1994, Grand Canyon superintendent Bill Sawyers told French that he would be transferred from the day shift to the night shift in section one. French told Sawyers that he could not work on the night shift because he depended on his brother, James French, for transportation, and his brother worked on the day shift. When Sawyers insisted on the transfer, French quit his job at Grand Canyon. The Board concluded that Grand Canyon constructively discharged French in violation of sections 8(a)(3) and 8(a)(1).

In order to prove constructive discharge, the Board's General Counsel must establish: 1) that the employer made the employee's working conditions intolerable; 2) that the employer intentionally made the conditions intolerable; and 3) that the employer did so because of the employee's union activities. See NLRB v. Bestway Trucking, Inc., 22 F.3d 177, 181 (7th Cir. 1994); J.P. Stevens & Co. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972). The issue of French's discharge presents a closer case than the other alleged violations. We conclude, however, that substantial evidence does support the Board's conclusion that Grand Canyon constructively discharged French in violation of sections 8(a)(3) and 8(a)(1).

First, the Board reasonably concluded that French's transfer to the night shift created an intolerable working condition. The Board previously has held that an employer's change in job shifts, or an employer's refusal to transfer an employee to another shift, can constitute an intolerable change in working conditions. See American Licorice Co.,

14

299 N.L.R.B. 145 (1990). Grand Canyon contends, however, that the shift change in the instant case did not create intolerable working conditions because French would have received the same pay and benefits on the night shift and because French's transportation problem was personal rather than work related. However, in American Licorice Co., 299 N.L.R.B. 145 (1990), the employer refused the employee's request for a transfer from the day shift to the night shift to attend to child care problems. The ALJ found that the employee's working conditions were not intolerable because the pay and benefits on both shifts were the same and because the employee's problem was personal rather than work related. The Board, however, reversed the ALJ's finding and concluded that the refused shift change created intolerable working conditions, even though the problem arose solely because of the employee's personal child care problems.

Grand Canyon attempts to distinguish American Licorice Co. on the ground that transportation is a less serious problem than child care and that it was French's responsibility to find alternative transportation. However, if an employer can create intolerable working conditions by refusing to consider an employee's personal child care problems, it seems that an employer similarly could create intolerable working conditions by refusing to consider an employee's transportation problems. We caution that an employer's refusal to consider an employee's transportation problems will not always or automatically create intolerable working conditions. We hold only that the Board reasonably concluded in this case, where French's truck was incapacitated and he was completely dependent on his brother for transportation, that Grand Canyon made French's working conditions intolerable.

Whether Grand Canyon intentionally made French's working conditions intolerable presents a close question. However, substantial evidence does support the Board's conclusion that Grand Canyon should have foreseen that its actions would cause French to resign because it knew that French could not work on the night shift. French testified that he had previously told foreman McCoy that his truck "blew up." James French, Larry French's brother, testified that he parked in the parking lot near the mine office. James also testified that Grand Canyon supervisors used the same parking lot. James further testified that foreman McCoy rode with the French brothers in James's truck on at

15

least one occasion, and foreman McCoy corroborated his testimony. Although the matter is close, the Board could legitimately infer from those facts that Grand Canyon knew that Larry French depended on his brother for transportation and that he could not work on the night shift. Thus, substantial evidence supports the Board's conclusion that Grand Canyon intentionally made French's working conditions intolerable.

Finally, substantial evidence also supports the Board's conclusion that Grand Canyon transferred French to the night shift because of French's union activities. French testified that on February 22, 1994, three days before Grand Canyon transferred him to the night shift, supervisor Woods accused him of being a "union instigator." Woods admitted that he made the statement, but he claimed that he was "[j]ust joking." French further testified that when Sawyers informed him of the transfer to the night shift, he asked whether any of the supervisors had heard that he had engaged in union activities. According to French, foreman McCoy replied that he had heard that French was a "union instigator[ ]". French's testimony was unrebutted. The questionable reasons that Grand Canyon offered to explain its action also support the Board's conclusion that Grand Canyon transferred French because of anti-union animus.[3] See Bestway Trucking, Inc., 22 F.3d at 181 (holding that "the demonstrated falsity of some of the reasons offered by [the employer] for its actions. . . support[s] the

_____

[3] Grand Canyon claims that it transferred French to the night shift because he could not bolt fast enough to maintain Grand Canyon's production standards on the day shift. Superintendent Sawyers testified that he therefore wanted to switch French and another employee on the day shift with two faster and more qualified employees on the night shift. Foreman McCoy corroborated Sawyers's testimony.

However, substantial evidence supports the Board's conclusion that Grand Canyon's asserted justification for the transfer was a pretext. French had worked for Sawyers for over five years with no reported problems. Grand Canyon failed to offer any personnel records to support its claim that French was a poor worker. Nor did Grand Canyon present any evidence that it had orally warned French to improve his performance. Moreover, Grand Canyon did not offer any evidence that the two roof bolters that it transferred from the night shift to the day shift were faster bolters than French.

16

Board's conclusion that [the employer] acted with anti-union animus" when it made the employees' working conditions intolerable).

In summary, if we could determine the issue independently, we might well conclude that Grand Canyon did not violate section 8(a)(3) when it transferred French to the night shift because the evidence is somewhat ambiguous whether Grand Canyon knew about French's transportation problems before it decided to transfer him to the night shift and therefore whether it intentionally made his working conditions intolerable. However, we may not determine the issue independently but instead must affirm the Board's conclusion as long as substantial evidence supports it. See Vance v. NLRB, 71 F.3d 486, 489 (4th Cir. 1995). We find that substantial evidence does support the Board's conclusion that Grand Canyon constructively discharged French in violation of sections 8(a)(1) and 8(a)(3).

V.

Accordingly, we enforce the Board's order in full.

ORDER ENFORCED