**EASTERN OMNI CONSTRUCTORS, INCORPORATED, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**National Labor Relations Board, Petitioner,**

**v.**

**Eastern Omni Constructors, Incorporated, Respondent.**

Nos. 97–2519, 97–2659.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 21, 1998.

Decided March 9, 1999.

**ARGUED:** Catherine Ricks Piwowarski, Ward & Smith, P.A., New Bern, North Carolina, for Eastern Omni. Christopher Warren Young, National Labor Relations Board, Washington, DC, for Board. **ON BRIEF:** William Joseph Austin, Jr., Ward & Smith, P.A., New Bern, North Carolina, for Eastern Omni. Frederick L. Feinstein, General, Linda Sher, Associate General, Aileen A. Armstrong, Deputy Associate General, Charles Donnelly, Supervisory Attorney, National Labor Relations Board, Washington, DC, for Board.

Before WIDENER, HAMILTON and LUTTIG, Circuit Judges.

Petition for review granted and cross-petition for enforcement denied by published opinion. Judge HAMILTON wrote the opinion, in which Judge WIDENER and Judge LUTTIG joined.

## OPINION

HAMILTON, Circuit Judge:

Eastern Omni Constructors, Inc. (EOC) petitions this court to review a decision and order of the National Labor Relations Board (the Board), and the Board cross-petitions for enforcement of its order. The Board's decision affirmed the decision of the administrative law judge (the ALJ). The ALJ held that EOC violated § 8(a)(1) of the National Labor Relations Act (the NLRA), 29 U.S.C.A. § 158(a)(1), by: (1) threatening to discharge employees who distributed union literature; and (2) maintaining and enforcing a rule prohibiting employees from placing non-company authorized decals on company-owned hardhats. The ALJ also ruled that EOC violated § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), by terminating two employees because of their union activities. For the reasons stated below, we grant EOC's petition for review and deny the Board's cross-petition for enforcement of its order.

### I

EOC provides industrial construction services for Proctor & Gamble's manufacturing facility in Brown Summit, North Carolina. Based on Proctor & Gamble's needs, EOC is frequently required to hire large numbers of employees for short-term projects and then to reduce its work force by way of a reduction-in-force (RIF). According to Mike Barnum, EOC's vice president in charge of project management:

It's a very fluctuating need. Our clients will come in one day and come up with a project and we have to ... hire sometimes 50 to 100 people for a short term project and then lay off and get back down to a level. So if you look at our work force over [the] years, it looks like the Alps. Extreme fluctuations up and down.

In December 1995, EOC developed a short-term need for employees. At that time, EOC had two projects in progress that

needed to be completed for Proctor & Gamble by February 1, 1996. Consequently, EOC hired five pipefitters, two pipewelders, five electricians, and two electrician apprentices. Among those hired were Wacon Cottingham, Bill Forester, and Tommy West, all electricians, and Matt Steiner, an electrician apprentice. Each employee hired in December 1995 was informed of the short-term nature of the work. As Fred Redman, the electrical superintendent testified:

> It was basically the same with everyone I talked to. I wanted to point out to everyone the length of the job because I didn't want anyone giving up a job that they were holding for a short term job. At the time, we estimated the work we had to go to the end of January.

The addition of five electricians to EOC's work force necessitated the creation of a new electrical crew. To head the new crew, EOC promoted one of its electricians, Mitch Williams, to electrician foreman. Mitch Williams knew his promotion was temporary and would end once the projects with the February 1, 1996 deadline were completed.

EOC has a written distribution policy, which is contained in its employee handbook. The distribution policy prohibits employees from distributing union literature on EOC property "during working time." Working time is defined in the employee handbook "as time an employee is expected to be working." Excluded from the definition of working time is "an employee's free time, i.e., before or after work, lunch, break time or other free time, whether the employee is being paid for that time or not."

On December 26, 1995, on his way to EOC's non-smoking break trailer, Ted Williams, an EOC foreman, saw Forester, a member of the International Brotherhood of Electrical Workers, AFL–CIO (the Union or IBEW), distributing union literature five minutes before Forester's break was to begin.

Inside the non-smoking break trailer, Ted Williams reported his observation to Forester's foreman, Daryl Bailey. Exactly what Ted Williams told Bailey is disputed by the parties. The Board found that Ted Williams, who did not know Forester's name at the time, told Bailey "that if Ted Gammon [EOC's construction manager] saw the Union guy giving out Union literature on the job he was going to send [him] up the hill."[1] The Board's finding was based on Ted Williams' answer when asked on direct examination: "What did you say to Mr. Bailey." In response to this question, Ted Williams said "that if Ted Gammon saw the Union guy giving out Union literature on the job he was going to send [him] up the hill." When asked on cross-examination: "What exactly did you say to Mr. Bailey," Ted Williams responded: "I said that if Ted Gammon saw the Union guy giving out Union literature on company time he was going to run him up the hill." Steiner, who overheard Ted Williams' statement to Bailey, testified, both on direct and cross-examination, that Ted Williams used the phrase "on company time." Steiner was certain because he wrote Ted Williams' statement down "word for word."

On January 22, 1996, at a safety meeting with supervisors, Carl Harbin, EOC's project manager, announced that he had observed an employee with a Confederate flag decal on his company-owned hardhat. Harbin told the supervisors that he wanted all decals not supplied or authorized by EOC removed from company-owned hardhats. This directive was consistent with EOC's longstanding, yet laxly enforced, unwritten policy banning non-company authorized decals on company-owned hardhats.

The policy banning non-company authorized decals on company-owned hardhats was promulgated because of safety concerns. Decals on hardhats were used by EOC to enable supervisors to identify if an employee working on a particular piece of equipment actually possessed the necessary training and skills to operate that piece of equipment. For example, forklift operators and employees trained to work with high voltage wore decals to indicate their specialized training.

---

1. Ted Williams' reference to "up the hill" referred to the direction of the road leading away from the Brown Summit facility.

Further, decals on hardhats also served to assist in emergency situations, as some employees wore decals indicating they were trained in certain types of first-aid, such as CPR.

The following day, January 23, 1996, John Bauer, an electrical foreman, announced the rule to the electricians in a brief meeting. At the conclusion of the meeting, Cottingham and Forester, who had IBEW decals on their hardhats, conferred and decided to strike to protest being required to remove their IBEW decals. Cottingham and Forester informed Bauer that they were on an "unfair labor practice strike, and if he had any questions, he could call [the Union]." As they were punching out for the day, Cottingham and Forester told Bauer that they were going to wear their IBEW decals on their hardhats. Afterwards, Bauer reported to EOC management that two electricians had walked out claiming to be on strike.

On January 25, 1996, West returned to work after two days of leave. Mitch Williams informed West of the rule barring anything but company-authorized decals on hardhats. West asked Mitch Williams if he would be fired if he placed a union decal on his hardhat. Bauer overheard the conversation and asked West to come with him to Redman's office. There, Bauer and Redman told West that he would be disciplined if he put anything but a company-authorized decal on his hardhat. West put the union decal on his clothing and was not disciplined for this action.

On the same day, Cottingham and Forester returned to EOC to pickup their pay-checks. Gammon gave Cottingham and Forester their pay-checks along with forms that designated them as "voluntary quits"from EOC employment. Cottingham and Forester both returned the slips, indicating that they had not quit but were on strike. Gammon willingly accepted the return of the voluntary quit slips.

On January 31, 1996, EOC received a letter from the Union stating that Cottingham and Forester were engaged in an unfair labor practice strike in protest of EOC's violation of rights secured to them by the NLRA.

On February 8, 1996, EOC notified fourteen employees in various classifications that they were terminated pursuant to a RIF. Cottingham and Forester, whose positions were left open while they remained on strike, were terminated. On or about February 10, Cottingham and Forester received their notices of termination.

On February 21, 1996, the Union initiated this case by filing unfair labor practice charges with the Board. The Board's General Counsel issued a complaint on May 17, 1996. The ALJ held hearings on September 18 and 19, 1996, and issued a decision on April 27, 1997. The ALJ dismissed several of the claims that the Board's General Counsel had alleged. However, the ALJ found that EOC had committed several violations of the NLRA. Specifically, the ALJ found that: (1)EOC violated § 8(a)(1) of the NLRA by threatening employees with discharge for distributing union literature; (2) EOC violated § 8(a)(1) of the NLRA by banning all but company-authorized decals on hardhats; and (3) EOC violated § 8(a)(3) of the NLRA by terminating Cottingham and Forester because of their union activities. The ALJ's order requires EOC to cease and desist from the unfair labor practices found and from otherwise interfering with, restraining, or coercing employees in the exercise of their rights guaranteed by the NLRA. The ALJ's order also directs EOC to offer Cottingham and Forester full reinstatement to their former jobs or, if those jobs no longer exist,to substantially equivalent positions, without prejudice to their seniority or other rights or privileges previously enjoyed, and to make them whole for any loss of earnings and other benefits suffered as a result of the discrimination against them. Finally, the ALJ's order requires EOC to post an appropriate notice regarding its foregoing responsibilities.

EOC appealed to the Board, which, on October 7, 1997, adopted, in all material respects, the ALJ's decision and order. EOC now petitions this court to review the Board's decision and order, and the Board cross-petitions for enforcement of its order.

## II

The Board possessed subject matter jurisdiction below pursuant to 29 U.S.C. § 160(a). The Board's decision and order of October 7, 1997, constitutes a final order under the NLRA, and thus we possess appellate jurisdiction pursuant to 29 U.S.C. §§ 160(e) and (f).

The Board's decision is to be upheld if its factual findings are supported by substantial evidence on the record. *See* 29 U.S.C. § 160(e).This is so "even though we might have reached a different result had we heard the evidence in the first instance." *NLRB v. General Wood Preserving Co.*, 905 F.2d 803, 810 (4th Cir.1990). "Substantial evidence has been held to mean 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting*NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp.*, 855 F.2d 1174, 1178 (6th Cir. 1988)).

## III

■■■ Under § 8(a)(1) of the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the NLRA. 29 U.S.C. § 158(a)(1). Section 7 guarantees employees, among other things, the right to "self-organization, to form, join or assist labor organizations." *Id.* If a right guaranteed by § 7 is implicated, a § 8(a)(1) violation is established if, "under all the circumstances, the employer's conduct may reasonably tend to coerce or intimidate employees." *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1044 (4th Cir.1997). The employer's language or acts need not be "'coercive in actual fact.'" *Equitable Gas Co. v. NLRB*, 966 F.2d 861, 866 (4th Cir. 1992). Rather, we must determine "whether the conduct in question had a reasonable tendency in the totality of circumstances to intimidate." *Id.* The question of "[w]hether particular conduct is coercive is a 'question essentially for the specialized experience of the NLRB.'" *Grand Canyon*, 116 F.3d at 1044.

■■■ Our § 8(a)(1) inquiry does not end here. We must also balance "the employee's protected right against any substantial and legitimate business justification that the employer may give for the infringement." *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4th Cir. 1998). "[I]t is only when the interference with § 7 rights outweighs the business justification for the employer's action that § 8(a)(1) is violated." *Textile Workers Union v. Darlington Mfg. Co.*, 380 U.S. 263, 269, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); *see also Eastex, Inc. v. NLRB*, 437 U.S. 556, 570–74, 98 S.Ct. 2505, 57 L.Ed.2d 428(1978) (balancing interests). This determination is also squarely within the specialized expertise of the Board. *See Medeco Sec. Locks, Inc.*, 142 F.3d at 745. "[I]t is the primary responsibility of the Board and not the courts to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *Jeannette Corp. v. NLRB*, 532 F.2d 916, 918(3d Cir.1976) (citation and internal quotation marks omitted). We must affirm the Board's balancing if it is rational and consistent with the NLRA. *See Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978);*Medeco Sec. Locks, Inc.*, 142 F.3d at 745. Accordingly, "an independent violation of § 8(a)(1) exists when: (1) an employer's action can be reasonably viewed as tending to interfere with, coerce, or deter; (2)the exercise of protected activity; and (3) the employer fails to justify the action with a substantial and legitimate business reason that outweighs the employee's § 7 rights." *Medeco Sec. Locks, Inc.*, 142 F.3d at 745.

## A

■■■ EOC contends that the Board erred when it found that EOC violated § 8(a)(1) of the NLRA based on Ted Williams' statement to Bailey in the non-smoking break trailer on December 26, 1995. According to the Board, Ted Williams' statement to Bailey, that "if Ted Gammon saw the Union guy giving out Union literature on the job he was going to send [him] up the hill," violated § 8(a)(1) because the statement was tantamount to a threat to all employees that they would be discharged even if they distributed union literature at work during a permissible time,

*e.g.,* break time. *See Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 797–804, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (employees are entitled to distribute union literature during nonworking time in nonworking areas of an employer's property unless special circumstances justify banning distribution).

■EOC strenuously argues that the Board erred in finding that Ted Williams used the phrase "on the job," instead of "on company time," when he described Forester's activities to Bailey. While we agree with EOC that substantial evidence does not support the Board's finding in this regard,[2] whether Ted Williams used the phrase "on the job"or "on company time" is irrelevant because, in either case, Ted Williams' statement, placed in context, did not coerce, deter, or interfere with the exercise of protected activity.

In its proper context, Ted Williams, a supervisor, was reporting to Bailey, Forester's supervisor, a violation of EOC's distribution rule, which the Board apparently concedes is a valid one. In addition to this report, Ted Williams offered the view that if Gammon saw this breach, Forester would be terminated. Under these circumstances, there is nothing to suggest that Ted Williams sought to coerce, deter, or interfere with Steiner's, let alone any other employee's, § 7 rights. Furthermore, the statement was made under circumstances free from any unfair labor practice, and there is nothing to suggest that Ted Williams' statement was coupled with any statements or company conduct that would suggest to a reasonable audience that his statement amounted to an unlawful threat. Finally, the danger of a misunderstanding by Steiner or any other employee was slight, as EOC's written policy on distribution allows distribution during an employee's "free time, i.e., before or after work, lunch, break time or other free time, whether

the employee is being paid for that time or not," and prohibits distribution during the time an employee "is expected to be working." Accordingly, we conclude the Board erred when it found that Ted Williams' statement to Bailey amounted to a violation of § 8(a)(1) of the NLRA.

**B**

■ EOC contends that the Board erred in finding that EOC violated § 8(a)(1) of the NLRA by maintaining and enforcing a rule that prohibited employees from placing union decals on their hardhats. We agree.

■ In *Republic Aviation Corp.,* the Supreme Court held that employees have a presumptive right to wear union insignia. 324 U.S. at 803–04, 65 S.Ct. 982. The right to wear union insignia, which furthers "the right effectively to communicate with one another regarding self-organization at the job site," *Beth–Israel,* 437 U.S. at 491, 98 S.Ct. 2463, is not absolute. Rather, the right to wear union insignia can be abridged when the employer demonstrates that special circumstances exist which justifies the banning of union insignia. *Republic Aviation,* 324 U.S. at 803–04, 65 S.Ct. 982; *see also Meijer, Inc. v. NLRB,* 130 F.3d 1209, 1214–1217 (6th Cir.1997)(applying special circumstances approach to total ban of union insignia); *NLRB v. Malta Constr. Co.,* 806 F.2d 1009, 1011–12 (11th Cir.1986) (applying special circumstances approach to rule allowing union insignia on clothing and personal property but not on hardhats); *Midstate Tel. Corp. v. NLRB,* 706 F.2d 401, 403–04 (2d Cir.1983) (applying special circumstances approach to rule banning a particular type of T-shirt); *Virginia Elec. & Power Co. v. NLRB,* 703 F.2d 79, 82–83 (4th Cir.1983) (applying special circumstances approach to partial ban of union insignia); *Pay'n Save Corp. v. NLRB,* 641 F.2d 697, 701–02 (9th Cir.1981) (applying special

---

**2.** In our view, the Board's finding that Ted Williams used the phrase "on the job" is incredulous. On cross-examination, Ted Williams was asked "What *exactly* did you say to Mr. Bailey." (emphasis added). In response, Ted Williams stated "I said that if Ted Gammon saw the Union guy giving out Union literature on company time he was going to run him up the hill." And if this testimony were not enough to demonstrate that

Ted Williams used the phrase "on company time," Steiner's testimony made this conclusion unassailable. Steiner, who overheard Ted Williams' statement to Bailey, testified, both on direct and cross-examination, that Ted Williams used the phrase "on company time". Steiner was certain because he wrote Ted Williams' statement down "word for word."

circumstances approach to rule banning the wearing of political, controversial, or offensive insignia); *Davison–Paxon Co., Div. of R.H. Macy & Co. v. NLRB*, 462 F.2d 364, 366–72 (5th Cir.1972) (applying special circumstances approach to rule banning large and conspicuous button on sales floor); *Serv–Air, Inc. v. NLRB*, 395 F.2d 557, 562 (10th Cir.1968) (applying special circumstances approach to rule banning the wearing of multiple badges); *Fabri–Tek, Inc. v. NLRB*, 352 F.2d 577, 585 (8th Cir.1965) (applying special circumstances approach to a partial ban of union insignia); *Caterpillar Tractor Co. v. NLRB*, 230 F.2d 357, 358–59 (7th Cir.1956) (stating that employer can prohibit employees from wearing buttons emblazoned with the slogan "Don't be a Scab" because of slogan's inherent tension to incite unrest and resentment; however, the restriction does not include "passive in offensive advertisement of organizational aims and interests ... which in no way interferes with discipline and production").

EOC advances three special circumstances which it contends justified its rule banning non-company authorized decals on hardhats. First, EOC argues that safety factors justified the ban on non-company authorized decals on hardhats. *See Pay'n Save Corp.*, 641 F.2d at 701 (noting that safety concerns can be a special circumstance). Because EOC was concerned that non-company authorized decals on hardhats could create, and delay reaction to, dangerous situations in its industrial facility, it submits it was justified in attempting to avoid these dangerous situations.

Decals on hardhats were used by EOC to enable supervisors to identify if an employee working on a particular piece of equipment actually possessed the necessary training and skills to operate that piece of equipment. For example, forklift operators and employee strained to work with high voltage wore decals to indicate their specialized training and skills. Further, decals on hardhats also served to assist in emergency situations, as some employees wore decals indicating they were trained in certain types of first-aid, such as CPR. These concerns for safety were valid and amply supported EOC's deci-

sion to ban non-company authorized decals on hardhats.

The potential for serious injury at EOC, as with most industrial facilities, is self-evident. EOC was not required to wait until an employee was electrocuted before instituting a ban on non-company authorized decals on hardhats. *Cf. Virginia Elec. & Power Co.*, 703 F.2d at 83 (employer is not required to show that a disturbance or violence has occurred before it can regulate the wearing of union insignia). All that is required is that the employer demonstrate that special circumstances justified the ban. *Republic Aviation*, 324 U.S. at 803–04, 65 S.Ct. 982. Here, valid safety considerations justified the ban.

 Second, EOC argues that concerns regarding employee discipline justified the ban on non-company authorized decals on hardhats. *See Pay'n Save Corp.*, 641 F.2d at 701 (noting that concerns about employee dissension can be a special circumstance). Because EOC was concerned that non-company authorized decals on hardhats could create a disturbance or confrontation between employees, it submits it was justified in attempting to prevent such a disturbance or confrontation. Unfortunately for EOC, it did not present this justification to the Board. Therefore, we decline to address it here in light of the command of § 10(e) of the NLRA, 29 U.S.C. § 160(e), which states that "[n]o objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." Finding no extraordinary circumstances to excuse EOC, we cannot consider this justification. *See NLRB v. Kotarides Baking Co., Inc.*, 340 F.2d 587, 588 (4th Cir.1965).

Third, EOC contends that the ban on non-company authorized decals on hardhats was justified on the basis that it allowed its employees to wear decals on their clothing. In essence, EOC contends that its rule regarding non-company authorized decals on hardhats was merely a preference that employees not wear decals on hardhats because of its concerns regarding safety.

We are mindful that we have never held that the mere fact that an employer allows an employee to wear union insignia on his or her clothing justifies a ban on wearing union insignia on hardhats. However, that an employer prohibits some, but not all, union insignia is a factor that courts, including this one, have looked to in determining whether special circumstances are present. *See, e.g., Virginia Elec. & Power Co.*, 703 F.2d at 82–83 (upholding employer's objection to an employee wearing a large, brightly colored, and potentially provocative button when employer did not ban all buttons); *Fabri–Tek, Inc.*, 352 F.2d at 586 (upholding employer's objection to employees wearing IBEW vari-vue buttons when employer did not ban all buttons); *Andrews Wire Corp.*, 189 NLRB 108, 109 (1971) (safety concerns and fact that employees were permitted to wear union insignia on their clothing justified ban of non-company approved insignia on hardhats); *Standard Oil Co.*, 168 NLRB 153, 159 (1967) (same).

In this case, EOC left intact its employees' presumptive right to wear union insignia. EOC employees were permitted to wear union insignia on all of their attire except hardhats. This was not a total ban on union insignia. Rather, this case, like *Virginia Elec. & Power Co., Fabri–Tek, Inc., Andrews Wire Corp.*, and *Standard Oil Co.*, involves a partial, inconsequential ban on union insignia. At all times, EOC's employees' right to wear union insignia was scrupulously honored by EOC. It simply strains credulity to conclude that the right of EOC's employees to effectively communicate with each other regarding unionization was somehow stymied by EOC's ban on non-company authorized decals on hardhats.

In the final analysis, the dispute concerning the union insignia is trivial. Granted, labor relations is industrial warfare. But,

> [s]omewhere, in the vast human experience, there must be an inconvenience so minimally damaging, so utterly trivial, so profoundly petty, that it should not give

rise to a [a § 8(a)(1) violation]. If so, this is it.

*Beraho v. S.C. State College*, 302 S.C. 129, 394 S.E.2d 28, 29 (1990)(Sanders, C.J., concurring). It follows from the above discussion·that we will not enforce that portion of the Board's order finding that EOC violated § 8(a)(1) of the NLRA by banning all but company-authorized decals on hardhats.

## IV

Finally, EOC challenges the Board's finding that the terminations of Cottingham and Forester were motivated by their union activities. We agree with EOC that substantial evidence does not support the Board's finding of a § 8(a)(3) violation.

■ Discriminatory discharge is an unfair labor practice under § 8(a)(3)of the NLRA, 29 U.S.C. § 158(a)(3).[3] However, an employer's actions violate this section only if they are motivated by anti-union animus. *See Goldtex, Inc. v. NLRB*, 14 F.3d 1008, 1011 (4th Cir.1994). In *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935 (4th Cir.1995),we set forth the standard to be applied in § 8(a)(3) cases:

> The Board has established a formula for determining when an allegedly discriminatory discharge violates the [Act]. First, the General Counsel must make out a prima facie case that the employer's decision to lay off an employee was motivated by anti-union animus. The burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity. To make out a prima facie case, the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action. Motive may be demonstrated by circumstantial as well as direct evidence and is a factual issue which the expertise of the Board is peculiarly suited to determine.

**3.** Section 8(a)(3) of the NLRA provides in pertinent part: "It shall bean unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158(a)(3).

*Id.* at 942 (citations and internal quotation marks omitted).

The issue in this case, then, is whether substantial evidence on the whole record can sustain the Board's finding that the terminations of Cottingham and Forester were partly or wholly motivated by the purpose of discouraging union activities at EOC. *See NLRB v. Instrument Corp. of America,* 714 F.2d 324, 328 (4th Cir.1983). Although the Board's determination of motive will not be overturned if it is reasonable, "mere speculation as to the [employer's] real motives registers no weight on the substantial evidence scale." *Id.* (citations and inter-nal quotation marks omitted). Of course, EOC can attempt to rebut the *prima facie* case once established by presenting a valid business justification. *See Goldtex, Inc.,* 14 F.3d at 1013.

We agree with EOC that the Board's finding that Cottingham and Forester's union activities were a substantial and motivating reason behind EOC's decision to terminate Cottingham and Forester is not supported by substantial evidence. The Board found that the RIF was economically motivated, but went on to conclude that Cottingham and Forester were discriminatorily selected for inclusion in the RIF. There cord in this case simply does not support this conclusion.

Cottingham and Forester were hired in December 1995 to fill a short-term need for electricians at EOC, as the two main projects they were hired to help complete were scheduled to be completed by February 1, 1996. Indeed, when they were hired, Cottingham and Forester knew their jobs would last six to eight weeks. As the work on these projects drew to a close, EOC's need to maintain a full complement of employees dissipated. Consequently, on February 8, 1996, fourteen employees were subject to the RIF: four pipefitters; two pipefitter apprentices; one pipewelder; four electricians, including Forester and Cottingham; two electrician apprentices; and one welder who was assigned to the electrical crew. At the time of the RIF, Mitch Williams, who was temporarily promoted to foreman, returned to his position as an electrician. Thus, the record, taken as a whole, demonstrates that Cotting-ham and Forester were hired in late December 1995, within a couple of weeks they went out on strike, and after a couple of more weeks, when the projects they were hired to help complete were about to be finished, they were terminated along with twelve other employees. We see nothing sinister or anti-union in EOC's actions. EOC simply treated Cottingham and Forester, along with other similarly situated employees, exactly the way it said it was going to treat them when it hired them.

The Board relied on basically two pieces of evidence in concluding that Cottingham and Forester's selection for the RIF was motivated by their union activities. First, the Board relied on part of a statement made by Gammon during his testimony before the ALJ. When discussing why Cottingham and Forester were selected for the RIF, Gammon stated "[t]hey were not there and that was it." Because the reason Cottingham and Forester were "not there" was because "they were on strike," the Board concluded that EOC's selection of Cottingham and Forester for inclusion in the RIF was motivated by their union activities. The Board's reliance on Gammon's statement is misplaced. Gammon's complete statement in response to the question "What was the reason for including" Cottingham and Forester in the RIF was: "They were not there and that was it. I mean they were gone." When asked whether he had any understanding about where Cottingham and Forester were at the time of the RIF, Gammon testified that he heard that Cottingham and Forester were in Atlanta, Georgia. This latter portion of Gammon's testimony was consistent with the testimony of Ted Williams, Bauer, and Redman who all testified that West told them that, at the time of the strike, Cottingham and Forester were going to work in Atlanta, Georgia, presumably on projects relating to the 1996 Summer Olympic Games. Thus, placed in context, Gammon's testimony is properly understood as stating that Cottingham and Forester were "gone" because they were working in Atlanta, Georgia, and not, as the Board interpreted it, as stating that Cottingham and Forester were "not there" because they were on strike. In its proper context,

Gammon's testimony simply does not support the Board's finding that Cottingham and Forester's union activities were a substantial or motivating reason behind EOC's decision to include Cottingham and Forester in the RIF.

Second, the Board relied on the fact that EOC tendered voluntary quit slips to Cottingham and Forester on January 25, 1996, to support its finding that Cottingham and Forester's union activities were a substantial or motivating reason behind EOC's decision to include Cottingham and Forester in the RIF. On January 23, 1996, Cottingham and Forester went on strike to protest EOC's ban on non-company authorized decals on hardhats. On January 25, 1996, Cottingham and Forester went to pick up their paychecks and, along with their pay-checks, they were tendered voluntary quit slips. Gammon acknowledged that he knew the voluntary quit slips were being tendered along with the paychecks, but added that they were prepared because he had heard that Cottingham and Forester had walked off the job. When Cottingham and Forester told Gammon they were on strike, Gammon willingly accepted the return of the voluntary quit slips and, in fact, held their jobs open until the February 8, 1996 RIF. Under these circumstances, we fail to see how the voluntary quit slips, which were handed, rejected, and willingly accepted for return in a matter of moments, were intended to punish or deter Cottingham and Forester from engaging in protected activity. Rather, the record reflects that Cottingham and Forester were treated as strikers and their jobs were held open until economic factors beyond EOC's control necessitated a RIF, of which Cottingham and Forester both knew they would inevitably be a part.

V

For the reasons stated herein, the petition for review is granted and the Board's cross-petition for enforcement is denied.

*PETITION FOR REVIEW GRANTED; CROSS–PETITION FOR ENFORCEMENT DENIED*