**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AMERICAN CRANE CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent,

No. 98-2660

INTERNATIONAL BROTHERHOOD OF
BOILERMAKERS, IRON SHIP BUILDERS,
BLACKSMITHS, FORGERS AND HELPERS,
AFL-CIO,
Intervenor.

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                                    No. 98-2775

AMERICAN CRANE CORPORATION,
Respondent.

On Petition for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations Board.
(11-CA-16292, 11-CA-16583, 11-CA-16763, 11-CA-17235)

Argued: December 2, 1999

Decided: January 24, 2000

Before TRAXLER and KING, Circuit Judges,
and Margaret B. SEYMOUR, United States District Judge
for the District of South Carolina, sitting by designation.

_____

Petition for review denied and cross-application for enforcement granted by unpublished opinion. Judge King wrote the opinion, in which Judge Seymour joined. Judge Traxler wrote an opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Gary Alan Reeve, LAW OFFICE OF MOWERY & YOUELL, Worthington, Ohio, for American Crane. Jill Ann Griffin, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Mark Aloysius Kistler, BLAKE & UHLIG, Kansas City, Kansas, for Intervenor. **ON BRIEF:** Spencer Martin Youell, LAW OFFICE OF MOWERY & YOUELL, Worthington, Ohio; Jack W. Burtch, Jr., MCSWEENEY, BURTCH & CRUMP, P.C., Richmond, Virginia, for American Crane. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board. Michael T. Manley, BLAKE & UHLIG, Kansas City, Kansas, for Intervenor.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

KING, Circuit Judge:

American Crane Corporation petitions for review of the September 30, 1998 Decision and Order of the National Labor Relations Board ("NLRB" or "Board"), affirming the findings of an Administrative Law Judge ("ALJ") that American Crane violated the National Labor Relations Act ("NLRA" or "Act") by engaging in myriad unfair labor practices. The Board cross-applies for enforcement of its Decision and Order. For the reasons that follow, we deny American Crane's

2

petition for review and grant the Board's cross-application for enforcement.

I.

The employees of American Crane's manufacturing facility in Wilmington, North Carolina, voted on October 12, 1994 to accept representation by the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers, AFL-CIO (the "Union"). Between November 18, 1994 and October 23, 1996, the Union filed four charges with the NLRB, alleging that American Crane had committed a host of unfair labor practices during a twenty-five month period commencing in the weeks prior to the representation election and continuing through September 1996. These charges resulted in the issuance of complaints by the Board on April 4, 1996 and November 29, 1996.**1**

The matter was assigned to an ALJ, who, during eight days of hearings, considered the testimony of more than two dozen witnesses and received into evidence scores of exhibits. The ALJ subsequently issued a Decision on June 24, 1997, concluding that American Crane had violated several provisions of Section 8(a) of the NLRA.

The ALJ found seven independent violations of Section 8(a)(1) of the Act, which proscribes "interfer[ing] with, restrain[ing], or coerc-[ing] employees" who attempt to exercise their rights to self-organize

_____

**1** The NLRB acted pursuant to the authority granted it by the Act, which provides, in pertinent part:

> Whenever it is charged that any person has engaged in or is engaging in any . . . unfair labor practice, the Board . . . shall have power to issue and cause to be served upon such person a complaint stating the charges in that respect, and containing a notice of hearing before the Board or a member thereof . . . .

29 U.S.C. § 160(b). The Union was granted leave to intervene in the proceedings. See id. ("In the discretion of the member, agent, or agency conducting the hearing or the Board, any other person may be allowed to intervene in the said proceeding and to present testimony."); 29 C.F.R. § 102.29 (1998) (detailing the administrative process regarding motions to intervene).

and collectively bargain. 29 U.S.C. § 158(a)(1). With respect to the termination of two employees, the suspension of a third, and warnings and unfavorable evaluations given a fourth, the ALJ found that American Crane had violated both Sections 8(a)(1) and 8(a)(3) of the Act, the latter barring "discrimination in regard to hire or tenure of employment or any term or condition of employment to. . . discourage membership in any labor organization." 29 U.S.C. § 158(a)(3).**2**

American Crane timely filed exceptions with the Board. See 29 U.S.C. § 160(c); 29 C.F.R. § 102.46 (1998). The company objected to the ALJ's findings that it had committed unfair labor practices in four specific instances: (1) that, prior to the representation election, the company had coercively interrogated employees Freddie Clemmons and Cleatus Brown regarding their union activities; (2) that it had warned, suspended, and ultimately discharged Clemmons because of his association with the Union; (3) that the company had disciplined Brown and given him unfavorable performance evaluations on account of his Union ties; and (4) that it had discharged employee Johnny Thompson as a result of his Union affiliation.**3**

_____

**2** The Board considers any violation of Section 8(a)(3) to be a concurrent violation of Section 8(a)(1), and we have endorsed this approach. See Robertshaw Controls Co., Acro Div. v. NLRB, 386 F.2d 377, 383 (4th Cir. 1967) ("Any act which violates § 8(a)(3) necessarily violates § 8(a)(1) . . . .").

The ALJ also found that discipline imposed by a company supervisor against the fourth employee was motivated, at least in part, by the employee's testimony in the proceedings below. The supervisor's actions therefore violated Section 8(a)(4) of the Act, which forbids employers from "discharg[ing] or otherwise discriminat[ing] against an employee because he has filed charges or given testimony under this subchapter[.]" 29 U.S.C. § 158(a)(4).

Lastly, the ALJ found that American Crane had, on several occasions, refused to bargain with the Union concerning certain policy changes and employment actions, in contravention of Sections 8(a)(1) and 8(a)(5). Section 8(a)(5) of the Act requires that an employer collectively bargain with "the representatives of his employees." 29 U.S.C. § 158(a)(5). On appeal to the Board, however, the Union and the company jointly moved to withdraw the refusal-to-bargain allegations; that motion was granted. **3** In its brief before this Court, American Crane challenges numerous findings of unfair labor practices to which it filed no exceptions with the

A panel of the Board issued a Decision and Order affirming nearly all of the ALJ's findings. American Crane Corp. , 326 N.L.R.B. No. 153 (Sept. 30, 1998). The Board ordered American Crane to cease and desist from coercively interrogating its employees about their Union activities; to reinstate Clemmons and Thompson with backpay; and to expunge from its personnel records all references to the adverse employment actions taken against Clemmons, Brown, and Thompson.

American Crane now petitions us for review of the Board's Decision and Order. See 29 U.S.C. § 160(f) (providing for review in the court of appeals for "the circuit wherein the unfair labor practice . . . was alleged to have been engaged in . . . ."). The Board has filed a cross-application for enforcement of the same. See 29 U.S.C. § 160(e).

II.

Familiar principles guide our examination of the NLRB's Decision and Order. The Board's findings regarding questions of historical fact are conclusive if, viewed in the context of the entire record, they are supported by substantial evidence. 29 U.S.C. § 160(e), (f). Whether the circumstances of a particular case constitute an unfair labor practice under Section 8 of the Act generally presents a mixed question of law and fact, and the Board's conclusions in this respect must likewise be upheld if "supported by substantial evidence based upon the record as a whole." Sam's Club v. NLRB, 173 F.3d 233, 239 (4th Cir. 1999) (citations omitted). Even if the Board's determinations are contrary to the greater weight of the evidence, they may not be overturned if "it would have been possible for a reasonable jury to reach

_____

Board. Our review of these findings is foreclosed by Section 10(e) of the Act, which provides that "[n]o objection that has not been urged before the Board . . . shall be considered by the court[of appeals], unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e); accord, Eastern Omni Constructors, Inc. v. NLRB, 170 F.3d 418, 425 (4th Cir. 1999) (citation omitted). American Crane does not contend that extraordinary circumstances excuse its failure to initially bring to the Board's attention the additional issues it has presented for our review.

the [same] conclusion." <u>Allentown Mack Sales & Serv., Inc. v. NLRB</u>, 522 U.S. 359, 366-67 (1998).

A.

The Board adopted the ALJ's finding that American Crane had coercively interrogated Clemmons and Brown regarding their Union activities. In reviewing the Board's conclusion to ensure that it is supported by substantial evidence, we do not inquire whether the company's actions actually resulted in coercion. Instead, we need only ascertain whether the language or conduct at issue had a reasonable tendency to coerce or intimidate the targeted employees from exercising the rights accorded them by Section 7 of the Act.**4** <u>Eastern Omni Constructors, Inc. v. NLRB</u>, 170 F.3d 418, 423 (4th Cir. 1999) (citations omitted). If, considering the totality of the circumstances, it can be said that American Crane's questioning of Clemmons and Brown reasonably tended toward coercion or intimidation, then we must uphold the Board's decision that the company committed an unfair labor practice prohibited by Section 8(a)(1). <u>Id.</u>

1.

In mid-August 1994, Clemmons was selected by his peers to contact the Union. The primary purpose of this overture was to obtain signature cards for distribution to the employees, in the hopes of authorizing a representation election.

Not long thereafter, Clemmons, who worked in the tool room of the machine shop, was approached by Frank Moelter, the machine shop supervisor. As the two men conversed in isolation, Moelter related that he had heard that Clemmons was going to organize a union. In response, Clemmons maintained that he had not yet decided.

The ALJ found Moelter's solicitation of the extent of Clemmons's union involvement to be coercive. We have previously explained that a variety of factors may be relevant to a determination of coercive-

_____

**4** Section 7 guarantees employees, <u>inter alia</u>, the right to self-organize and to form, join, or assist labor organizations. 29 U.S.C. § 157.

6

ness, "including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of the questioning." NLRB v. Nueva Engineering, Inc., 761 F.2d 961, 966 (4th Cir. 1985) (citation omitted).

In Nueva Engineering, we upheld the Board's decision that the respondent employer had coercively interrogated an employee regarding his sentiments about unions in general. We concluded that substantial evidence supported the Board's finding of coerciveness in light of (1) the employer's stated opposition to its employees' attempt to organize; (2) the exchange having occurred in the office of the vice-president, initiated by a production foreman with the power to hire and fire; with (3) no explanation to the employee of the purpose behind the questioning; and (4) no assurances against retaliation. Id.[5]

The third and fourth factors underlying our decision in Nueva Engineering are, as the ALJ noted, also evidenced in this case. Moelter's reasons for attempting to ascertain Clemmons's intentions were left unexplained,[6] and Moelter offered no assurances that Clemmons could confide in him without fear of reprisal. Indeed, Clemmons's guarded response -- equivocal and of dubious accuracy -- suggests a tinge of trepidation as to the potential consequences of confessing his association with the Union. It turned out, of course, that Clemmons's apparent concern was not without foundation, see Section II.B.1., infra.

There are some factual distinctions, certainly, between Nueva

_____

[5] We noted also the presence of an aggravating factor, i.e., the supervisor's contemporaneous statement to the employee that mass layoffs would occur in the event that the organizing campaign succeeded. We observed that "[t]his open threat of reprisal for union activity underscores the coercive nature of [the supervisor's] interrogation." Nueva Engineering, 761 F.2d at 966.

[6] American Crane does not contend that either Moelter's questioning of Clemmons, or that of Jack Yow with regard to Cleatus Brown, see Section II.A.2., infra, was prompted by a"legitimate business justification" that would require us to balance the employer's interest in obtaining the information against the interest of the employees in the non-infringement of their Section 7 rights. See generally Eastern Omni, 170 F.3d at 423.

7

Engineering and the case at bar. The interrogation at issue here took place in a production area, rather than in an executive's office, and it is unclear whether Moelter had the power to fire Clemmons.

These minor differences, however, are of little moment. The salient facts are that (1) like the employee in Nueva Engineering, Clemmons was isolated from his peers during the questioning; and (2) Moelter, like the production foreman in Nueva Engineering , directly supervised the subject of his interrogation and was substantially involved in disciplining the employees under his charge. It hardly strains credulity to posit that an isolated employee is more vulnerable to coercion than one in the company of his compatriots, or that employees would be particularly anxious not to incur the wrath of the one person who, day in and day out, twirls the key to their job security.

Although it had not openly declared its hostility to the Union in the manner of the employer in Nueva Engineering, see, e.g., supra note 5, American Crane was nonetheless strongly opposed to the efforts of its employees to organize. On cross-examination before the ALJ, Moelter was asked whether he understood the company's position to be that "it did not want the Union to win the election." Moelter responded, "Definitely." In an environment where the employer was cognizant of an employee's organizational efforts prior to those plans beginning to bear fruit, it seems a fair inference that the employee was similarly aware of his employer's predilection for keeping its workplace union-free.

And, to be sure, Clemmons was not just any employee; he had been specifically chosen by his co-workers to seek out the Union's assistance. If the employees' attempt to organize could possibly be thwarted through coercion or intimidation, there was surely no more inviting target than Clemmons. Moreover, the nature of the information sought by Moelter was not merely Clemmons's stance on unions generally, as was the case with the interrogation at issue in Nueva Engineering, but whether Clemmons personally was going to organize a union. Moelter's question went right to the heart of the rights protected by Section 7 of the Act, see supra note 3, and thus was inherently more likely to coerce or intimidate than a more indirect line of inquiry.

8

We recognize that reasonable minds could differ as to the potential coercive effect of Moelter's query.**7** It is, however, precisely because of this uncertainty that we must defer to the Board's "specialized experience" with regard to resolving these sorts of questions. Eastern Omni, 170 F.3d at 423 (quoting NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1044 (4th Cir. 1997)) (internal citation omitted). We therefore conclude that, in light of all the circumstances surrounding Moelter's interrogation of Clemmons, the Board's finding of a Section 8(a)(1) violation is supported by substantial evidence.

2.

About a week before the representation election, in the wake of a number of incidents that gave rise to findings of unfair labor practices by American Crane, see supra notes 2 and 3, and Section II.B.1. infra, supervisor Jack Yow approached Brown while both men were in the restroom. Yow asked where Brown's Union button was. Brown, who had not yet openly declared his position on the Union, retorted that the answer was none of Yow's business.

The ALJ found Yow's interrogation to have a reasonable tendency to coerce or intimidate, and we agree. Against the backdrop of an increasingly tense and hostile unionization campaign, Yow isolated Brown and questioned him point-blank as to his Union loyalties. Yow did not explain why he wanted this information, and he offered no assurances that Brown could answer truthfully without fearing reprisal. We hold that, under these circumstances, substantial evidence

_____

**7** Indeed, the Board itself could not unanimously agree that Moelter had engaged in unlawful interrogation. See American Crane Corp., 326 NLRB No. 153, at 1 n.3 (Member Hurtgen's observation that Moelter's question, at most, "may arguably have created an impression of surveillance"). Even were we to accept Member Hurtgen's characterization of Moelter's actions, however, we have previously noted that "an employer violates section 8(a)(1) of the Act if it gives employees the impression that it is conducting surveillance of their union activities." NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1045 (4th Cir. 1997) (citations omitted).

supports the Board's finding that Yow's inquiry violated Section 8(a)(1) of the Act.**8**

B.

We next consider whether substantial evidence likewise supports the Board's determination that American Crane's discipline of Clemmons, Brown, and Thompson -- pursuant to which Clemmons and Thompson were discharged -- was motivated by the company's desire to discourage its employees from belonging to the Union. The ALJ found that American Crane's animus toward the Union and its adherents caused the company to treat Clemmons, Brown, and Thompson more harshly than it treated (or would have treated) other employees whose support for the Union was less discernible or non-existent.

To prove a discrimination violation under Section 8(a)(3) of the Act, the Board's General Counsel must first demonstrate by a preponderance of the evidence that (1) the employee had been engaged in protected activity; (2) of which the employer was aware; and (3) such activity was a substantial or motivating reason for the employer's decision to alter the employee's terms or conditions of employment. Sam's Club, 173 F.3d at 242. Once the requisite showing has been made, the burden shifts to the employer to produce evidence of a legitimate business motive, i.e., that it would have taken the same action even if the affected employee had not been engaged in protected activity. Id. at 242-43.

If the employer meets its burden of production, no violation of Section 8(a)(3) may be found unless, in light of all the evidence, the General Counsel establishes by a preponderance thereof "that union

_____

**8** American Crane's attempt to characterize Moelter's and Yow's interrogation as "casual" or "sporadic" are unavailing. The responses of Clemmons and Brown indicate that they perceived the questioning to be anything but a "casual comment made within the free flow of conversation between workers and supervisors." J.C. Penney Co., Inc. v. NLRB, 123 F.3d 988, 994 (7th Cir. 1997) (citation omitted). Moreover, it merely states the obvious to note that a "sporadic" violation of Section 8(a)(1) is nonetheless a violation.

antipathy did actually play a part in the decision." Id. at 243 (quoting NLRB v. Instrument Corp., 714 F.2d 324, 327 (4th Cir. 1983)). That the employer's stated reasons for its actions are shown to be pretextual is not enough, standing alone, to permit the finding of a violation; the General Counsel must affirmatively adduce evidence of sufficient substance to support a rational conclusion that anti-union animus more likely than not factored into the employer's decision. Sam's Club, 173 F.3d at 243 (citing Instrument Corp.).

1.

Clemmons was suspended and eventually terminated for allegedly threatening co-worker Russel Luhm during the first of a series of confrontations between the two on September 28, 1994, two weeks before the representation election. Clemmons, as we have noted, began the campaign to organize American Crane's employees, and the company was aware of his leadership status.

With regard to the incident involving Luhm and Clemmons, the ALJ found that (1) the two men engaged in several heated exchanges, during which each provoked the other with various belligerent comments; (2) Luhm aggressively initiated physical contact with Clemmons in the bathroom, bumping into Clemmons's chest so that Clemmons had to move his head back; (3) Luhm instigated a subsequent verbal altercation in the toolroom; and (4) Clemmons promptly reported the matter, indicating his preference to Moelter that further conflict be avoided.[9] Plainly, Luhm was at least as culpable as Clemmons for the entire unfortunate episode, yet only Clemmons was discharged. Indeed, Luhm was not disciplined at all.

Why the discrepancy? The evidence gives rise to a strong inference that Clemmons was treated differently because his views concerning the Union were different from Luhm's. During his initial confrontation with Clemmons, Luhm looked pointedly at Clemmons's Union button and said, "Bull." A few moments later, Luhm told Clemmons, "You better watch it, buddy, because the Company's got ways of dealing with people like you."

_____

[9] More precisely, Clemmons told Moelter, "If you don't get Russ off my back, I'm going to have to knock him on his ass."

11

It did not take long for "the Company" to make a prophet of Luhm. American Crane suspended Clemmons soon after the incident, and it discharged him on October 7, scant days before the election. At the hearing below, the company could offer only the flimsiest justification for its actions. Carol Davis, the company's Human Resources Manager, testified that Clemmons was suspended for being "upset with Mr. Luhm in the bathroom because [Luhm] was calling his Mother a name." The ensuing termination was apparently based on Clemmons's failure to deny Moelter's attribution to him of certain statements, perceived to be threatening, that Clemmons supposedly made during the bathroom confrontation.

When pressed, however, Davis could not point to any particular statement that Clemmons might have made that would have justified his termination. In fact, Davis could not recall any specific statement attributed to Clemmons by Moelter. All that Davis could say is that Clemmons "threatened" Luhm by "call[ing] him names, curs[ing] at him."[10] Asked if she were aware of anyone at American Crane having previously been fired for using profanity, Davis responded in the negative.

Davis did mention that American Crane had, from time to time, terminated certain employees for engaging in aggressive behavior toward others. All of these instances, however, involved far more serious conduct than that at issue here. In one case, an employee had thrown a sharp wedge at a supervisor. On another occasion, an employee had actually wielded a knife against a co-worker. A third incident involved an employee who had interfered with a colleague's job performance, and who had made specific threats of bodily harm.

In short, American Crane's "business justification" for discharging Clemmons was woefully inadequate, and it in no way served to rebut the compelling circumstantial case that the company took advantage of a timely opportunity to rid itself of a principal Union organizer.[11]

_____

[10] Moelter likewise could identify no specific statement that might have led to Clemmons's discharge. He agreed with Davis, however, that the decision was based on what Clemmons said to Luhm in the bathroom and not on what Clemmons later told Moelter. See supra note 9.

[11] The Board is, of course, entitled to infer the employer's discriminatory motive from all the evidence, both direct and circumstantial. Grand Canyon Mining Co., 116 F.3d at 1047 (citing Nueva Engineering).

12

We therefore uphold, as supported by substantial evidence, the Board's finding that the company's suspension and termination of Clemmons violated Section 8(a)(3) of the Act.

2.

Brown, who worked in the receiving department, was given a written warning on October 19, 1994, for failing to properly store crane parts in their designated areas. Brown's supervisor, Inez Crisp, testified that her inability to locate the misplaced components had resulted in delayed shipments and the temporary reassignment of work crews. The representation election had been conducted only one week prior to Brown's warning; on the day of the election, Brown had worn a Union button in the presence of supervisors Crisp and Yow.

The ALJ found that Brown had been given no prior notice of any alleged deficiency in his job performance. Indeed, in the wake of a nine-part evaluation by Crisp in 1993, Brown received highly positive scores in three categories, and was only graded below average in two. By contrast, following another evaluation in August 1996, Brown was deemed significantly above average in only one category; he received below-average scores in six of the remaining eight categories, including three in which he was accorded the lowest possible rating. About a month after this latter evaluation, on September 25, 1996, Crisp issued Brown a "final counseling," alleging, among other things, that Brown had been insubordinate.

The ALJ determined that the various warnings and the poor evaluation were motivated by Crisp's anti-Union animus, which the ALJ described as "intense in nature."[12] At the hearing, Crisp could provide

_____

[12] The ALJ found that Crisp had enforced American Crane's "no solicitation" rule against an employee (Zachary Givens) who had discussed the Union on company time, while those who had violated the rule in ways unrelated to the organization of company employees had gone unpunished. Thereafter, just prior to the election, Crisp transferred Givens to the shipping department for the purpose of isolating him from the other employees. Crisp was also responsible for evaluating Givens, whose scores -- like Brown's -- plummeted once his Union sentiments became known.

13

no credible, objective evidence sufficient to support a conclusion that Brown was incompetent or had misbehaved. In light of American Crane's failure to adequately justify its treatment of Brown, we hold that substantial evidence supports the Board's finding of a Section 8(a)(3) violation.

3.

Thompson, the group leader of the assembly department, was discharged in the aftermath of an incident involving his supervisor, Jerry Strickland. Thompson testified that he left work early on July 14, 1995, after he became upset with Strickland. The two had conversed twice briefly concerning work matters, and, according to Thompson, Strickland had insinuated that Thompson had been dishonest.

Thompson informed Strickland that he was leaving, and that Strickland could charge him with a personal day or an "early out." Strickland did not respond, and he remained silent even as Thompson exited past him a few minutes later. Thompson was suspended and ultimately discharged for being absent without authorization, and for insubordination.

The record reveals that Thompson wore a Union button before the election and for three weeks thereafter, and that he played an instrumental role in a prior unsuccessful organizing campaign. Thompson had begun to again wear his Union button in the weeks prior to the July 14, 1995 incident.

Employees at American Crane are entitled to four personal days and four "late ins" and/or "early outs" per year. Although the company took the position in Thompson's case that any personal time had

_____

According to the ALJ, Crisp's testimony during the hearing was "contradictory" (of itself), and her demeanor rendered her a less credible witness. We must, of course, accept the ALJ's assessment of a witness's credibility absent "exceptional circumstances" that would lead us to conclude it is without logical foundation. See Sam's Club, 173 F.3d at 240. We can discern no reason to disregard the ALJ's credibility determinations in this case.

to be prearranged, there was evidence that the company's practice was to the contrary. According to the employee handbook, workers were only required to give the company one hour's notice of a personal day, and there is no indication that American Crane had the discretion to deny such a demand. This interpretation of the policy was verified by employee testimony, and no less an authority than the company's manufacturing manager acknowledged previous instances of employees not being disciplined in spite of "telling" their supervisors that they were leaving.

Even if Thompson's absence could be classified as unauthorized, it was conceded below that an employee would not be discharged until the third such offense. Davis herself testified that a first unauthorized absence would result only in "verbal counseling" of the employee by the designated supervisor.

Thompson could not have been legitimately terminated for the reasons proffered by American Crane. He was not subject to discharge for a single unauthorized absence, and, contrary to the company's assertions, there was no evidence that he was insubordinate in any way toward Strickland. The ALJ reached the only conclusion that he could under these circumstances: Thompson was discharged because he supported the Union -- a plain violation of Section 8(a)(3) of the Act.

III.

In light of the preceding discussion, we deny American Crane's petition for review. We grant, in its entirety, the Board's cross-application for enforcement of its September 30, 1998 Decision and Order.

PETITION FOR REVIEW DENIED, AND CROSS-APPLICATION FOR ENFORCEMENT GRANTED

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

Although I agree that the majority of the Board's findings are supported by substantial evidence, I believe the Board erred in finding

15

that Moelter's statements to Clemmons amounted to unlawful interrogation in violation of § 8(a)(1), and in finding that American Crane terminated Thompson because of his union activities in violation of § 8(a)(3). Thus, I respectfully dissent from the portions of the majority opinion which uphold these findings.

To establish a violation of § 8(a)(1), there must be substantial evidence that "the conduct in question had a reasonable tendency in the totality of the circumstances to intimidate," even if not "coercive in actual fact." NLRB v. Nueva Eng'g Inc., 761 F.2d 961, 965 (4th Cir. 1985) (internal quotation marks omitted). Thus, it is not unlawful for a supervisor to question or interrogate employees"about their union sentiments . . .[,] provided such questioning is not coercive." Id. To determine whether a particular incident is coercive, the court "must consider a variety of factors including the history of employer hostility to the union, the nature of information sought, the identity of the questioner, and the place and method of the questioning." Id. at 966.

In Nueva, a high-ranking supervisor asked an employee during the pendency of a campaign whether he supported the union. When the employee responded in the affirmative and attempted to explain his position, the supervisor interjected that unionization would result in a "big layoff." Id. at 966. Several facts were recited as supportive of the determination that the questioning was coercive. It took place after the supervisor had followed the employee and two others home from a cancelled union meeting, and after the vice-president of the company had made a speech reflecting open hostility towards the union. Additionally, it occurred in the company vice-president's office, with no explanation of its purpose or assurance against reprisal.

According to Clemmons, he was selected to contact the Union in mid-August 1994. The alleged "interrogation" by Moelter occurred within a week or two, and consisted of a single statement: "that he [Moelter] had heard that Clemmons was going to organize the Union." J.A. 1458. When Clemmons responded that he had not yet decided, the conversation ended. While true that Moelter did not explain the purpose of his statement to Clemmons nor expressly state that no retaliation would occur, the similarities to Nueva thereafter end. American Crane (unlike the employer in Nueva), although

16

opposed to unionization, had not instituted an anti-union campaign or otherwise exhibited hostility to the Union when the conversation took place. Furthermore, in my view, the conversation did not take place in isolation. Clemmons testified that it occurred while the men were standing by the toolroom door, in the middle of the machine shop. There is no evidence that anyone heard Moelter's statement to Clemmons, but it indisputably occurred in the area where both men worked. Clemmons was not removed from his work environment to be "interrogated" about his union sympathies or his intentions. And, in my view, the natural and informal nature of the surroundings seem compatible with the absence of any formal statement of purpose or need for an assurance against retaliation on the part of Moelter. Finally, I find it significant, albeit not dispositive, that Clemmons did not testify that Moelter's statement sounded threatening or intimidating. The ALJ acknowledged the absence of any evidence that Clemmons in fact felt coerced or intimidated by Moelter, and noted that the conversation "did not take place in an intimidating setting." J.A. 1459.

For these reasons, I believe the ALJ and the Board failed to give appropriate effect to the "totality of the circumstances" approach we endorsed in Nueva. Rather, the ALJ appears to have premised his finding on the erroneous belief that "[t]he test is the nature and timing of the interrogation" alone, J.A. 1459, concluding that Moelter's statement constituted a violation because it was made "just before the beginning of a union campaign" without an explanation of its purpose or an assurance against reprisal, id. Contrary to our holding in Nueva, I believe this approach renders the "[q]uestioning or interrogation of employees about their union sentiments . . . per se unlawful," and gives no consideration to whether the questioning was or was not intimidating or coercive or whether it could reasonably be interpreted as such. Nueva, 761 F.2d at 965. Hence, I fear the end result is not a fair evaluation of a question or statement in the full context in which it occurs, but an approach which will impose a violation upon the employer for any question asked by a supervisor about the union in the work environment.

I likewise find insufficient evidence to support the Board's finding that Thompson was terminated because of his union activity in violation of § 8(a)(3). Thompson was hired by American Crane in February 1985. The union election in which he participated as a principal

17

employee was an unsuccessful one which occurred in 1989. Thompson played no such principal role in the successful October 1994 election, apparently limiting his involvement to wearing a union button for a few weeks before and after this latter election. Additionally, the incident leading to Thompson's termination occurred over nine months after this election.

The only recent union activity on the part of Thompson was that he began to wear his union button in early July because the supervisors "`started watching the men a little closer.'" J.A. 1467. This activity, in turn, coincided with American Crane's July 5, 1995 promotion of Strickland, who had also been first employed in 1985, to supervisor of the assembly department. Eight days later, Strickland and Thompson had two disagreements regarding work-related matters. In response, Thompson told Strickland "that he was pushing the employees too hard, that they were getting the work done, and that if this did not stop it would turn around on Strickland and`bite him in the ass.'" J.A. at 1467. Thompson then told Strickland that he was leaving, and walked off the job. Strickland neither granted Thompson permission to leave, nor attempted to prohibit his doing so, and Thompson was subsequently discharged for walking off the job <u>and</u> for insubordination.

The majority upholds the Board's decision that Thompson was terminated as a result of his union activities -- relying primarily upon American Crane's allowance of four personal days and four "late ins" and/or "early outs" per year, testimony that employees had previously taken "early outs" without express permission, and American Crane's progressive discipline policy which would call for a verbal warning for a first such unauthorized absence. While the ALJ relied upon a similar basis to find a violation, the Board specifically declined to "pass on whether Thompson violated company policy on `early-outs' on July 14, 1995," concluding instead that a violation of § 8(a)(1) was established because Strickland "remained silent when Thompson informed him that he was taking the remainder of July 14 as a personal or vacation day, [thereby] impliedly[giving] Thompson permission to leave." J.A. 1455.

Under either rationale, I believe the evidence is insufficient to support a finding that American Crane violated its employee handbook

18

policy, or that Strickland's silence in the face of Thompson's threat constituted acquiescence to the latter's walking off the job; and both ignore Thompson's insubordination as a reason for his dismissal. More importantly, however, I believe that the evidence is woefully inadequate to support a conclusion that Strickland's behavior was motivated by Thompson's union activities, or that American Crane utilized the walk-off incident as a ruse for firing Thompson for such activities. The Board infers such a discriminatory intent based upon Thompson's principal participation in an unsuccessful union election which occurred ten years before his termination, which led to no adverse employment actions in the aftermath, and his minor participation in a successful union election which occurred nine months before his termination. And Thompson's brief period of wearing the union button in early-July also seems too slim a reed upon which to rest such an inference. There being, in my view, insufficient evidence that Thompson's union "activity was a substantial or motivating reason" for American Crane's decision to terminate him, see Sam's Club v. NLRB, 173 F.3d 233, 242 (4th Cir. 1999), I respectfully dissent.

19